**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick (#004738)
J. James Christian (#023614)
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Fax: (602) 255-0103
rgh@tblaw.com
jjc@tblaw.com

Liaison Counsel for Plaintiffs

**THE ROSEN LAW FIRM P.A.**
Phillip Kim (*pro hac vice*)
Laurence Rosen (*pro hac vice*)
Timothy Brown (*pro hac vice*)
350 Fifth Avenue, Suite 5508
New York, NY 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
tbrown@rosenlegal.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

|  |  |
|---|---|
| JENNIFER BURRITT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> vs. <br><br> NUTRACEA, BRADLEY D. EDSON, TODD C. CROW, AND DAVID BENSOL, <br> Defendants. | No. CV-09-00406-PHX-FJM <br> **(Consolidated)** <br> <u>CLASS ACTION</u> <br><br> PLAINTIFFS' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

STATEMENT OF FACTS…………………………………………….…….…...1

ARGUMENT……………..………………………………….…………….....7

I.   APPLICABLE PLEADING STANDARDS………………………………7

II.  PLAINTIFFS ADEQUATELY ALLEGE CLAIMS FOR SECURITIES FRAUD
     UNDER SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5…...10

   A.  The Complaint Adequately Alleges The Defendants Made Misstatements of
       Material Fact ……………………………………...……………………10

   B.   Plaintiffs' Complaint Adequately Alleges a Strong Inference of Scienter.12

       1.  The *Magnitude* of the Accounting Fraud Supports a Strong
           Inference of Scienter………………………………………..12

       2.  Defendants' Departure From Their Own Publicly Announced
           Accounting Policies Support a Strong Inference of
           Scienter…………………………………………………………..15

       3.  The Fraudulent Nature of the  Transactions Support a Strong
           Inference of Scienter……………………………………...……17

       4.  The Court Confidential Witness Allegations Demonstrate a Strong
           Inference of Scienter………………………………………..24

             i.  CW1 and CW2…………..……………………25
             ii.  CW3…………………………………………27

       5.  Under *South Ferry* and its Progeny, Each Defendant Knowingly or
           Recklessly Made Misstatements…………………………28

       6.   Additional Scienter Allegations…………………………..……30

       7.   Defendants Are Not Saved by *Zucco Partners v. Digimarc*…...…35

   C.  The Complaint Adequately Alleges Loss Causation………………......…36

   D.  The Complaint Adequately Alleges Reliance……………………...…40

III. THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION
     20(A) OF THE EXCHANGE ACT………………………………………..46

i

IV. THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER A.R.S. § 44-1991(A)(3) AND § 44-2003(A) …..……………………………………...………47

    A.  Claims under 44-1991(A)(3) Are Governed by Strict Liability………..…47

    B.  Defendants Violated Arizona Securities Law Even If They Did Not Dispose of Any Securities Or Make an Offer to Plaintiffs…………………………49

    C.  Defendants Participated in the Sale of Securities and Induced Plaintiffs To Purchase Securities……………………………………………...………51

    D.  Defendants Are Liable Regardless of Privity or a Lack Thereof…………53

    E.  The Complaint Adequately Alleges Claims under A.R.S. § 44-1999(B)…53

CONCLUSION………………………………..………………………..……………..53

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## CASES

*Aaron v. Fromkin,*
    196 Ariz. 224 (App. 2000)……………………………………………..47, 48, 52

*Aaron v. SEC,*
    446 U.S. 680 (1980)……………………………………….…..……………48

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009)………………………………..……….....37

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)……………..……… ……..…………14

*Basic v. Levinson,*
    485 U.S. 224 (1988)………………………………………...……..41

*Batwin v. Occam Networks, Inc.*,
    2008 WL 2676364 (C.D. Cal. July 1, 2008)……………………………..…41

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007)..……………………,……………………………....7, 37

*Bernstein v. Crazy Eddie, Inc.,*
    702 F.Supp. 962 (E.D.N.Y. 1988) ……………………………….………19

*Binder v. Gillespie,*
    184 F.3d 1059 (9th Cir. 1999)…………………………………...…..…41, 45

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989)…………..…..……………41, 42, 43, 44, 45, 46

*Carlson v. Xerox.,*
    392 F.Supp.2d 267 (D. Conn. 2005)……………………..……..…….19

*Carrington v. Ariz. Corp. Comm'n,*
    199 Ariz. 303 (App. 2000)…………………………………..…………….48

*Cheney v. Cyberguard Corp.,*
    213 F.R.D. 484 (S.D. Fla. 2003) ..……………………………..…....43

*Connecticut Retirement Plans and Trust Funds v. Amgen,*
  2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) ………….…………………………46

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005)………………………………...…………...10, 36, 37, 40

*Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,*
  206 Ariz. 399 (App. 2003)……………………………………………….………51

*Ganino v. Citizens Utils. Co.,*
   228 F.3d 154 (2d Cir. 2000) …………………………………………..……...12

*Garvin v. Greenbank,*
  856 F.2d 1392 (9th Cir. 1988)…………………………………….…………...47

*Giligan v. Jamco Dev. Corp.,*
  108 F.3d 246 (9th Cir. 1997) ………….………………….…………….……...7

*Grand v. Nacchio,*
  2009 WL 3103761 (Ariz. App. Div. 2, Sept. 29, 2009) …………….………..52

*Griffin v. GK Intelligent Sys. Inc.,*
  196 F.R.D. 298 (S.D. Tex. 2000)...…………………………………………….44

*Hayes v. Gross,*
  982 F.2d 104 (3d Cir. 1992)…………………………….……………….….…42

*Hoexter v. Simmons,*
  140 F.R.D. 416 (D. Ariz. 1991) ………………………………………….....46

*Howard v. Everex Sys.,*
  228 F.3d 1057 (9th Cir. 2000)…………………………………………….…..31

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ……………………………….…...……11

*In re Baan Co. Sec. Litig.,*
  103 F. Supp. 2d 1 (D.D.C. 2000)……………………………………………...17

*In re Bradley Pharmaceuticals, Inc. Sec. Litig.,*
  421 F.Supp.2d 822 (D.N.J. 2006)……………………………………….....39, 40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Business Objects S.A. Sec. Litig.*,
    2005 WL 1787860 (N.D. Cal. July 27, 2005)……..…………….…..…………….33

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996)……………………...……………....……17

*In re Connetics Corp. Sec. Litig.*,
    257 F.R.D. 572 (N.D. Cal. 2009) ……………..….……………….....……….46

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F.Supp.2d 1132 (C.D. Cal. 2008) ……………….....……………..……..15

*In re Cylink Sec. Litig.*,
    178 F.Supp.2d 1077 (N.D. Cal. 2001) ……………….....……….…...……….11

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir.2005)……..……………………....…………*passim*

*In re DRDGOLD Ltd., Sec. Litig.*,
    472 F.Supp.2d 562 (S.D.N.Y. 2007) …………………………….…....…...11

*In re Empyrean Bioscience, Inc. Sec. Litig.*,
    255 F. Supp.2d 751 (N.D. Ohio. 2003)..……………….......……….….…..42, 46

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005)…………….….…..……...……17

*In re Gilead Sciences Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) …………………………..….….…....…..37

*In re Gupta Corp. Sec. Litig.*,
    900 F. Supp.2d 1217 (N.D. Cal. 1994) …………………....……….…....…12

*In re Hansen Natural Corp. Sec. Litig*
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)…………………….……..……33, 34

*In re HiEnergy Techs., Inc. Sec. Litig.*,
    2006 WL 2780058 (C.D. Cal. Sept. 26, 2006)…………………….....................46

*In re Hypercom Corp. Sec. Litig.*,
    2006 WL 726791 (D. Ariz. Mar. 9, 2006))………………………..………14, 20

*In re IMAX Secs. Litig.*,
    587 F.Supp.2d 471, 483 (S.D.N.Y. 2008) ..………….….….……....……17

*In re Impax Labs., Inc. Sec. Litig.*,
    2007 U.S. Dist. LEXIS, at * 26- *27 (N.D. Cal. Jul. 18, 2007) …………......……33

*In re Keithly Instruments, Inc. Sec. Litig.*,
    268 F.Supp.2d 887 (N.D. Ohio 2002) …………….……….…..……......………45

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    2006 WL 538756 (D. Or. Jan. 3, 2006)…………………………………….........33

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)……………………………………13, 14

*In re Microstrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000)…………..…….…..…………...…….....12, 15

*In re Motorola Sec. Litig.*,
    505 F.Supp.2d 501 (N.D. Ill. 2007)……………………………………...........40

*In re Nature's Sunshine Product's Inc. Sec. Litig.*,
    251 F.R.D. 656 (D. Utah 2008)…………………………………....……....…43

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) …………………………………….……34

*In re Nuvelo, Inc., Sec. Litig.*,
    2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) …………………………………….34

*In re OCA, Inc. Sec. and Deriv. Litig.*,
    2006 WL 3747560 (E.D. La. Dec. 14, 2006)…...……………………………......34

*In re Parmalat Sec. Litig.*,
    375 F.Supp.2d 278 (S.D.N.Y. 2005)……………………………………………41

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003)………………...……………..……....…...9, 10, 29

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002)……………………………………......15

*In re Seitel, Inc. Sec. Litig.*,
    447 F. Supp. 2d 693 (S.D. Tex. 2006)....................................................15, 40

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)..................................................9, 29

*In re Sipex Corp., Secs. Litig.*,
    2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ..........................................11

*In re Syncor Intern. Corp. Sec. Litig.*,
    327 F. Supp. 2d 1149 (C.D. Cal. 2004)....................................................33

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp.2d 247 (S.D.N.Y. 2008)....................................................37

*In re Time Warner, Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993)....................................................31

*In re Top Tankers, Inc. Sec. Litig.*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007)....................................................9

*In re Turbodyne Techs., Inc. Sec. Litig.*,
    2000 WL 3396113 (C.D. Cal. Mar. 15, 2000)..........................................42

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F.Supp.2d 964 (N.D. Cal. 2009)....................................................33, 36

*In re Vantive Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)....................................................9, 29

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 231 (S.D.N.Y. 2006)....................................................17

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)..........................................15

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F.Supp.2d 1148 (C.D. Cal. 2007) ....................................................34

*Johnson v. Alijan*,
    257 F.R.D. 587 (C.D. Cal. 2009)....................................................36

*Krogman v. Sterritt,*
    202 F.R.D 467 (N.D. Tex. 2001)…………………………………………………43

*Lehocky v. Tidel Techs., Inc.,*
    220 F.R.D. 491 (S.D. Tex. 2004) …………………………………………......43

*Lentell v. Merrill Lynch,*
    396 F.3d 161 (2d Cir. 2005)………………………………………...........…..36

*Levine v. SkyMall, Inc.,*
    2002 WL 31056919 (D. Ariz. May 24, 2002)…….....……….......…41, 42, 44, 45

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) …………………………...….…….……………37

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    513 F.3d 702 (7th Cir. 2008) ……………………………………………………19

*Marksman Partners, L.P. v. Chantal Pharm. Corp.,*
    927 F.Supp. 1297 (C.D. Cal. 1996) …………………..……………….33 n.14

*McGuire v. Dendreon Corp.,*
    2008 WL 5130042 (W.D. Wash. Dec. 5, 2008)…………….……………..……9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
    540 F.3d 1049 (9th Cir. 2008)……………………………………………*passim*

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003)……………………….……………..32, 33

*O'Neill v. Appel,*
    165 F.R.D. 479 (W.D. Mich. 1996) …………………………………….........43

*Orthologic Corp. v. Columbia/HCA Healthcare Corp.,*
    2002 WL 1331735 (D. Ariz. Jan. 07, 2002)……………………………...........49

*Patel v. Parnes,*
    253 F.R.D. 531 (C.D. Cal. 2008)…………………………………..……8

*Payne v. DeLuca,*
    433 F.Supp.2d 547 (E.D. Pa. 2006) ………………………….………..11

*Pirraglia v. Novell, Inc.*,
    339 F. 3d 1182 (10th Cir. 2003)………..……………………….....…...…..17

*Provenz v. Miller*,
    102 F. 3d 1478 (9th Cir. 1996)……..…………………..……………….....17

*Raymond v. Merrill Lynch, Pierce, Fenner & Smith*,
    1991 WL 520500 (C.D. Cal. Aug. 5, 1991)……………………....………42

*Reiger v. Price Waterhouse Coopers LLP*,
    117 F.Supp.2d. 1003 (S.D. Cal. 2000) …..……………….……………..15

*Rosier v. First Fin. Capital Corp.*,
    181 Ariz. 218 (App. 1994)……………………..…………………...……...47

*Roth v. Aon Corp.*,
    2008 LEXIS 18471 (N.D. Ill. Mar. 7, 2008)…..…………………..…...15

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)…..………………………………………….15

*Schleicher v. Wendt*,
    2009 WL 761157 (S.D. Ind. Mar. 20, 2009*)* …………………………45

*S.E.C. v. Gane*,
    2005 WL 90154 (S.D. Fla. Jan. 4, 2005) ……..……..……….............43

*SEC v. Grossman*,
    1987 U.S. Dist. LEXIS 1666 (S.D.N.Y. Feb. 17, 1987) ……….............20

*Siporin v. Carrington*,
    200 Ariz. 97 (App. 2001)………………………………………….......51

*Sirota v. Solitron Devices, Inc.*,
    673 F.2d 566 (2d Cir.) 459 U.S. 838 (1982) ………………………...….19

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)..……….…….............................*passim*

*Standard Chartered PLC v. Price Waterhouse*,
    190 Ariz. 6 (App. 1996)…..…………………..……………50, 51

*State v. Gunnison,*
127 Ariz. 110 (1980)...………………………………...…………47

*State v. Superior Court,*
123 Ariz. 324 (1979)……………….…...………….…….…...…47, 50, 51, 53

*Strom v. Black,*
22 Ariz. App. 102 (App. 1974)..……………………………………52

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.,*
2009 WL 890479 (D. Ariz. Mar. 31, 2009)…..……………….............9, 36, 38

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
2006 WL 216887 (S.D.N.Y. Aug. 1, 2006)…….………….…….….….…43

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.,*
127 S. Ct. 2499 (2007)…………………….….......................................*passim*

*Terra Ins. Co. v. New York Life Inv. Management, LLC,*
2009 WL 23658833 (N.D. Cal. Jul. 30, 2009) ………………….............45

*Trimble v. Am. Sav. Life Ins. Co.,*
152 Ariz. 548 (App. 1986)……………………………………….……52

*Trump v. Badet,*
84 Ariz. 319 (1958)………………..,……………………….…….…...50, 53

*U.S. v. York,*
933 F.2d 1343 (7th Cir. 1991) …………………………………………..14

*Wagner v. Barrick Gold,*
251 F.R.D. 112 (S.D.N.Y. 2008) ………………………...……………45

*Weiss v. Amkor Tech., Inc.,*
527 F.Supp.2d 938 (D. Ariz. 2007) ……………………………….…..27

*Wilson v. Williams,*
182 F.2d 562 (7th Cir. 1999) ……………….…...……………….……14

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009)…………………………...…………….*passim*

x

1

2

## STATUTES

15 U.S.C. § 78u-4(b)(2)…………………………………………....…………..8
15 U.S.C. § 78j(b) …………………………………………………......……...10
17 CFR § 240.10b-5……………………………………………......…….…...10
A.R.S. § 44-1991…………………………………………………….....…….48
A.R.S. § 44-1991(A) ………………………………………………….46, 49
A.R.S. § 44-1991(A)(1)……………………………………………………...48
A.R.S. § 44-1991(A)(2)……………………………………………………...48
A.R.S. § 44-1991(A)(3) ……………………....…………46, 47, 48, 52
A.R.S. § 44-1992.……………………………………………………………48
A.R.S. § 44-1999(B) ……………………………………………….....……...52
A.R.S. § 44-2001………………………………………………………….….49
A.R.S. § 44-2002………………………………………………………….….49
A.R.S. § 44-2003……………………………………......………49, 50, 52
A.R.S. § 44-2003(A)……………………………….46, 49, 51, 52
A.R.S. § 44-2032………………………………………………………....….49
A.R.S. § 44-2082(B)……………………………………………….....….….48

Federal Rule of Civil Procedure 8(a)(2)……………………….....….…...37
Federal Rule of Civil Procedure 9(b) …………………………….....……....8
Federal Rule of Civil Procedure 12(b)(6)………………....................7, 10, 37
Federal Rule of Evidence 201(b)..…………………………………....…..4, 45

## OTHER AUTHORITIES

Securities Act of Arizona, ch. 18, § 20, 1951 Ariz. Secs. Laws 46, 75……………………48

1  Lead Plaintiff Harvey Pensack, and named plaintiffs Jennifer Burritt and
2  Jose Medrano (collectively "Plaintiffs"), individually and on behalf of all other
3  persons similarly situated submit this consolidated memorandum in opposition to
4  the three separate motions to dismiss the First Amended Consolidated Class
5  Action Complaint filed by Defendants NutraCea, Bradley D. Edson, and Todd C.
6  Crow (collectively "Defendants").

## STATEMENT OF FACTS

8  This securities class action alleges material misrepresentations and
9  omissions of material fact and is brought on behalf of persons and entities, other
10  than Defendants, who purchased NutraCea common stock ("Stock") during the
11  period between April 2, 2007 and February 23, 2009 (the "Class Period"), seeking
12  remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,
13  and Rule 10b-5 thereunder and under the Arizona securities laws.

14  NutraCea, or the "Company," is a small California corporation with
15  principal offices in Phoenix, Arizona. *See* First Amended Consolidated Class
16  Action Complaint (the "Complaint"), ¶2.[1] NutraCea manufactures, develops and
17  markets nutraceuticals and related food products. During the Class Period, a
18  majority of the Company's sales and revenue were derived from a very small
19  number of customers. For fiscal year ("FY") ended December 31, 2006, five
20  customers accounted for 67% of the Company's total sales revenue, with one
21  customer, ITV Global, Inc. ("ITV"), accounting for 45% of the Company's total
22  sales. For FY ended December 31, 2007 six customers, including ITV accounted
23  for 59% of the Company's total product sales revenue. ¶3. Defendant Bradley D.
24  Edson ("Edson") was NutraCea's CEO, President, and director during the Class
25  Period. Edson was forced to resign on March 10, 2009 because of the accounting

---

27  1  Citations to the Complaint will be referred to herein as "¶" (or "¶¶") followed by the
   number of the specific paragraph(s) cited to.

fraud. ¶43. Defendant Todd C. Crow ("Crow") was the CFO until he resigned, also because of the fraud, on November 6, 2008. ¶44. At all relevant times, the Company's Stock was actively traded on the NASDAQ Bulletin Board, until it was delisted on May 5, 2009 as a result of NutraCea's failure to timely file its corrected financial statements with the Securities and Exchange Commission ("SEC"). ¶¶42, 131.

During the Class Period, Defendants materially overstated the Company's revenue and net income in violation of the most fundamental Generally Accepted Accounting Principles ("GAAP") and the Company's own publicly stated revenue recognition policy. Defendants overstated revenue and net income, reporting "record" results for certain periods, and substantial profits, when in fact, the Company had actually incurred net losses. ¶¶63-81, 83, 100. Significantly, all but one of the improperly recorded revenue transactions, occurred on the eve of the end of the fiscal quarters. *E.g.,* ¶10, 13, 20.

At least three of the four improper transactions were nothing but sham revenue transactions, as one was a consignment arrangement in which the product was not shipped to the customer, Famous Discoveries, and did not obligate Famous Discoveries to purchase any product. *E.g.,* ¶¶19, 74-79. Another transaction involved a secret arrangement in which the purchase was funded with a loan from a former executive officer of, and current consultant to the Company. *E.g.,* ¶9. The third transaction involved a sham-round trip transaction. *E.g.,* ¶¶21, 80-81. Notably, the revenue initially recorded on these transactions has all been *reversed.* The last transaction, involving a "bill and hold" arrangement with ITV, was fraudulent because NutraCea had obtained a fraudulently backdated letter from its customer in order prematurely recognize revenue on this transaction. *E..g,* ¶1, 68d, & e.

2

PLS.' CONSOLIDATED MEMORANDUM OF P&As IN OPP. TO DEFS.' MOTIONS TO DISMISS THE FIRST
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendants' fraud involved the Company' largest customers and concerned four very large transactions. The Company has warned that it will likely record additional restatement adjustments as it continues its internal investigation. *E.g.*, ¶6.

The accounting fraud resulted in the Company overstating its revenue and net income as follows:

- The $1.6 million Famous Discoveries transaction that occurred and was recorded in December of 2006 allowed the Company to report "record" results for Q4 2006 and FY 2006. ¶83. Defendant Edson even touted the "record results" and the Company's "first full year of profitability." ¶84. This transaction allowed the Company to overstate revenue in Q4 2006 by 43% and allowed the Company to report Q4 2006 net income of$778,000 when in fact the Company had a net loss of $505,000. The transaction also allowed the Company to overstate FY net income by 425%! *E.g.*, ¶86d.

- The $2.6 million related loan transaction and the $5 million round-trip transaction (which occurred on June 2007) allowed the Company to yet again report "record results" and overstated the Company's Q2 2007 revenue by 141% or $7.6 million and allowed the Company to report net income of $2 million when in truth the Company had an un profitable quarter losing $4.7 million for that period. *E.g.*, ¶¶104d.

- The fraudulent ITV $2 million "bill and hold" transaction which occurred and was recorded in December 2007, allowed the Company to overstate Q4 2007 revenue by nearly 52%. *E.g.*, ¶ 112a.

During the time when Defendants were fraudulently recording revenue, Defendants issued false reassurances to investors about the nature and quality of NutraCea's revenue recognition practices. ¶93-97, 105. Defendants' fraudulent misrepresentations enabled the Company to complete a $20 million stock offering

3

PLS.' CONSOLIDATED MEMORANDUM OF P&As IN OPP. TO DEFS.' MOTIONS TO DISMISS THE FIRST
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

in April 2008 to raise much needed cash, and for Edson to receive a rare cash bonus of $280,000 in April 2008 that exceeded his entire salary in 2007, each of which occurred only a few weeks after the Company filed its materially false and misleading Q4 and FY 2007 results with the SEC on March 17, 2008. ¶142.

As a result of the accounting fraud, (i) the SEC commenced a formal investigation of NutraCea's accounting for the items that are the subject of the restatement; (ii) the Company's stock was delisted from the NASDAQ Bulletin Board; (iii) CEO Edson was forced to leave the Company; and (iv) CFO Crow was replaced after two replacement CFO left prior to having to sign the Company's financial statements and Sarbanes-Oxley certifications--Notably, the CFO the Company was finally hired and retained to replace Crow, inexplicably resigned as well. *E.g.*, ¶¶ 27-28, 147, 148.

When the truth of Defendants' accounting fraud was partially disclosed to the market on February 23, 2009, the price of NutraCea Stock fell over 29% damaging Plaintiffs and the Class.  ¶30.

<u>NutraCea's 10-K, Dated October 20, 2009</u>:  After market-close on October 20, 2009 (the day before the filing of Plaintiffs' opposition papers), NutraCea filed a 185 page annual report for the fiscal year-ended December 31, 2008.[2]   A copy of the 10-K is attached to the Declaration of Phillip Kim ("Kim Decl.") as Ex. 1.[3]

---

2   Plaintiffs reserve their right to seek leave to file additional submission analyzing the Company's recently filed 10-K, after Plaintiffs have had a sufficient amount of time to fully review analyze the lengthy document.

3   The Court can take judicial notice of NutraCea October 20, 2009 10-K.  Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). It is well established in the Ninth Circuit that courts may take judicial notice of public financial information, including historical stock prices and documents filed with the SEC. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

1   The 10-K contained the Company's restatement adjustments set forth above (Ex.

2   1, at pp. F-11-F-14), and contains additional information about the accounting

3   fraud.  The 10-K makes clear that the restatement adjustments detailed above were

4   the result of fraud by Edson and Crow.  The 10-K states in relevant part:

5       The Audit Committee concluded that the errors and irregularities were
6       primarily the result of an ineffective control environment which, among
        other things, permitted the following to occur:
7       •      recording of improper accounting entries; and
8       •      **withholding information from, and providing of improper
        explanations and supporting documentation to, the Company's Audit**
9       **Committee and Board of Directors, as well as its independent
        registered public accountants.**
10

11  Kim Decl., Ex. 1 at p. 72.

12      The 10-K soft-pedals Defendants' fraudulent conduct by using euphemisms

13  such as "providing of improper explanations and supporting documentation"

14  instead of the more accurate terms for what occurred: "lying and providing false

15  information." The 10-K demonstrates that the withholding of information and

16  improper explanations (lying) was done by Edson and Crow.  The 10-K states that

17  "senior management failed to emphasize, through consistent communication ***and***

18  ***behavior,*** … which, among other things, resulted in information being withheld

19  from, …"  Kim Decl., Ex. 1 at p. 73.

20      There's more. Edson's false reassurances during the Q1 2007 conference

21  call that he was aware of the importance of the Company's revenue recognition

22  polices, that they were important, that he had intense discussion with the auditors,

23  and that he does not make a "mistake twice" further supports this conclusion.

24  ¶¶95-96. As does Crow's false reassurances. ¶¶105, 150.

25      That Edson and Crow are the "senior management" that withheld

26  information and made improper explanations is further demonstrated by the

27  Company's annual report for the fiscal year ended December 31, 2007 filed with

28

the SEC on March 17, 2008.  The 2007 10-K states that "Under the supervision and with participation of our management, including our Chief Executive Officer and Chief Financial Officer" an evaluation of NutraCea's internal controls were taken.  *See* Kim Decl., Ex. 2 at p. 36.[4]  There Edson and Crow identified a material weaknesses concerning revenue recognition.   The 2007 10-K states in relevant part:

> We do not have adequate procedures to assure that **significant** and complex **transactions are timely analyzed and reviewed**. As a result, significant adjustments to the results of operations have been required at year-end and at the end of last three quarters of 2007 prior to filing our 10-K and 10-Qs for 2007, **including adjustments relating to revenue recognition**, **valuation of certain receivables**, classification of settlement expenses and goodwill impairment.

Kim Decl., Ex. 2 at p. 37.  Edson and Crow promised to implement a remediation plan that would ensure the Company's revenue recognition practices are consistent with GAAP for transactions in excess of $100,000 per customer per quarter, or over $250,000 in any one year and to verify that collectibility is reasonably assured. Edson and Crow also assured investors that the Board will expand its documentation requirements and receive analyses from the CFO and COO when reviewing significant transactions; to improve the Company's month-end and quarter-end closing documentation; and take other remedial steps to improve accounting and disclosure controls.  *See* Kim Decl., Ex. 2 at p. 37-38.

The October 20, 2009 10-K discloses yet another improperly recognized revenue transaction recorded in Q2 2007 in the amount of the $2.1 million. *See* Kim Decl., Ex. 1 at p. F-13. While the customer made payments on the sale in Q3 and Q4 of 2007, a $1.4 million balance remained at the end of 2007. The 10-K

---

4   The court can take judicial notice of the Company's 2007 10-K. *Metzler*, 540 F.3d at 1064 n.7.  Indeed, Defendants have offered other excerpts of the document on their motion.

states that "[b]ased upon the facts discovered in the Additional Findings, the Company concluded the sale did not meet the criteria for revenue recognition, and therefore restated the transaction." Kim Decl., Ex. 1 at p. F-13. The effect of this restatement caused the Company's FY 2007 to be overstated by $1.4 million more than alleged in the Complaint. With this transaction, revenue for FY 2007 was overstated by $9,435,000 or 63% rather than the $7,970,000 or 56% alleged in the Complaint. *See* Kim Decl., Ex. 1 at p. 9, *cf.* ¶5c. Including this transaction for Q2 2007, revenue for that period was overstated by $9,682,000 or 292% rather than 103% alleged in the Complaint. Kim Decl., Ex, 1 at p. F-67 *cf.*, ¶5b.

The October 20, 2009 10-K also lists a number of "unresolved staff comments" concerning NutraCea's improper revenue recognition practices, which further demonstrates the pervasiveness of the accounting fraud. Kim Decl., Ex. 1, at p. 37. Indeed, the 10-K represents the Company's third accounting review. *See* Kim Decl., Ex. 1 at p. 4. More improper accounting practices may yet be disclosed.

## ARGUMENT

## I.   APPLICABLE PLEADING STANDARDS

When faced with a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts must presume that the allegations of the complaint are true, read the complaint as a whole, and give the plaintiff the benefit of all favorable inferences that can be drawn from its allegations. *Metzler*, 540 F.3d at 1055, n. 1. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *Giligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted). Plaintiffs need only "raise the right to relief above the speculative level on the assumption that all allegations in the complaint are true." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007).

1    Securities fraud claims are also subject to the heightened pleading

2    requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private

3    Securities Litigation Reform Act (15 U.S.C. § 78u-4 (b)(2). *Zucco Partners, LLC*

4    *v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). In order to satisfy Rule

5    9(b)'s standards, a complaint must state "with particularity the circumstances

6    constituting fraud or mistake." To comply with the requirements of Rule 9(b), a

7    plaintiff must plead with particularity, why a particular statement is false or

8    misleading.  *Zucco*, 552 F.3d at 990 (citations omitted).

9    The PSLRA requires plaintiffs asserting federal securities fraud claims to

10   "state with particularity facts giving rise to a strong inference that the defendant

11   acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite

12   recklessness must be an extreme departure from the standards of ordinary care,

13   and . . . present [ ] a danger of misleading buyers that is either known to the

14   defendant or so obvious that the actor must have been aware of it." *Patel v.*

15   *Parnes*, 253 F.R.D. 531, 555 (C.D. Cal. 2008). In other words, "reckless conduct"

16   can meet the PSRLA, but only "to the extent that it reflects some degree of

17   intentional or conscious misconduct, or what [the Ninth Circuit] has called

18   deliberate recklessness." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782

19   (9th Cir. 2008). The complaint sufficiently pleads reckless conduct if it "contain[s]

20   allegations of specific contemporaneous statements or conditions that demonstrate

21   the intentional or the deliberately reckless false or misleading nature of the

22   statement when made." *Metzler*, 540 F.3d at 1066.

23   For an inference of scienter to be strong, "a reasonable person would deem

24   [it] . . . cogent and at least as compelling as any opposing inference one could

25   draw from the facts alleged." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551

26   U.S. 308, 324 (2007). "[I]n determining whether the pleaded facts give rise to a

27   'strong' inference of scienter, the court must take into account plausible opposing

28

inferences." *Id*. The Ninth Circuit recently explained that, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991. If the inference of scienter is equally as compelling as any innocent inference, then the motion to dismiss must be denied. *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F.Supp.2d 763, 791-92 (D. Ariz. 2009) (explaining that under *Tellabs* "that a tie goes to the Plaintiff in terms of competing inferences of scienter") (quotation and citation omitted); *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007).

Indeed, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences' . . ." *Tellabs,* 551 U.S. at 324. Moreover, "to carry their burden on scienter, Plaintiffs . . . do not need to invalidate the inferences which Defendants raise." *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *7 (W.D. Wash. Dec. 5, 2008).

Ninth Circuit decisions, such as *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999), *In re Vantive Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), and *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003), which were made prior to *Tellabs*, viewed each allegation in isolation. After *Tellabs*, the Ninth Circuit "permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon Graphics*, *Vantive*, and *Read-Rite* notwithstanding." *South Ferry*, 542 F.3d at 784; *see Tellabs*, 511 U.S. at 326 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). Thus, after *Tellabs*, "vague, ambiguous, or general allegations," which may have been dismissed under *Silicon Graphics*, *Vantive*, and *Read-Rite*, "are now properly considered as a part of a

holistic review when considering whether the complaint raises a strong inference of scienter." *South Ferry*, 542 F.3d at 784.

## II. PLAINTIFFS ADEQUATELY ALLEGE CLAIMS FOR SECURITIES FRAUD UNDER SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5

The Complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against NutraCea, Edson, and Crow. Section 10(b) forbids the making of any "untrue statement of a material fact" in connection with the purchase or sale of any security. 15 U.S.C. §78j(b); 17 CFR § 240.10b-5. In order to properly plead a cause of action, a plaintiff must adequately allege that: (i) defendants misrepresented or concealed a material fact; (ii) with scienter (i.e., a wrongful state of mind); (iii) in connection with the purchase or sale of a security; (iv) upon which plaintiffs relied; (v) causing an economic loss; and (vi) establishing a causal connection between the material misrepresentation and the loss (often referred to as loss causation). *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

### A. The Complaint Adequately Alleges The Defendants Made Misstatements of Material Fact

Defendants do not seek dismissal on the grounds that the Complaint fails to adequately allege falsity or materiality. Therefore, the Court must assume for the purposes of Defendants' motions that Plaintiffs have adequately alleged a false statement of material fact. *Metzler*, 540 F.3d at 1055, n. 1; *Tellabs*, 551 U.S. at 322 ("faced with a 12(b)(6) motion to dismiss a §10(b) action, courts must, … accept all factual allegations in the complaint as true."). Indeed, Defendants cannot challenge the Complaint's allegations that Defendants misrepresented material facts as Defendants have admitted that NutraCea's prior financial results had to be

"restate[d]"[5] and should not be relied upon by investors due to accounting errors. *E.g.,* ¶¶120, 122, 127. "[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); *In re Sipex Corp., Secs. Litig.*, 2005 WL 3096178 * 1 (N.D. Cal. Nov. 17, 2005) ("Sipex's own public admission that its financial reports for the period in question should not be relied upon and would be 'restated' meant that the as-issued reports were materially inaccurate under GAAP."); *In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that … statements were restated at all" is sufficient to establish falsity at the pleading stage."); *In re DRDGOLD Ltd., Sec. Litig.*, 472 F.Supp.2d 562, 569 (S.D.N.Y. 2007) ("With respect to DRD's restatement of earnings, misreported financial data are clearly false statements of fact.").

Moreover, Defendants' overstatement of revenue and income were material as the necessary adjustments ranged from 9% to 425%, and in some periods, turned a previously reported profit into a loss. *E.g.* ¶¶5, 128. Such large

---

5  It is beyond dispute that Defendants' financial statements were false when made. The restatement adjustments are not the result of any subsequent *changed* circumstances or *change* in accounting principles. Restatements are only required for material accounting errors that existed at the time financial statements are prepared. ¶53 (citing Statement of Financial Accounting ("FAS") 154, ¶j.  Changes in accounting principles or changes in accounting estimates do not result in a restatement of financial statements, rather such changes result in "retrospective application." ¶ 54 (citing FAS 154, B10). A restatement is "the process of revising previously issued financial statements to reflect the ***correction of an error*** in those financial statements."  ¶54 (citing FAS 154, ¶J). An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement or mistakes in the application of GAAP.  ¶ 55 (citing FAS 154, ¶ h). Under FAS 1544, errors result form (i) mathematical mistakes; (ii) mistakes in the application of GAAP; or (iii) oversight or misuse of facts that ***existed at the time*** the financial statements were prepared. ¶154. Here, it is undisputed that a "retrospective application" did not result in the restatement. *See e.g. Payne v. DeLuca*, 433 F.Supp.2d 547, 577-78 (E.D. Pa. 2006) (collecting cases and reviewing the similar accounting principles and explaining that restatements are required when financial statements are false when made).

11

PLS.' CONSOLIDATED MEMORANDUM OF P&As IN OPP. TO DEFS.' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

overstatements of revenue and income, would have altered the total mix of information available to a reasonable investor. *See e.g. In re Gupta Corp. Sec. Litig.*, 900 F. Supp.2d 1217, 1231 (N.D. Cal. 1994) ("The materiality of a $1.1 million correction to revenue, which causes earnings to be restated from a profit of $520,000 to a loss of $250,00, and which represents more than 5 percent of total revenues is beyond question."); *see also In re Microstrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 658 (E.D. Va. 2000) (explaining that of all restatements adjustments, ones that impact revenue and earnings tend to be material); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (explaining "earnings reports are among the pieces of data that investors find most relevant to their investment decisions") (citation and quotation omitted).

## B. Plaintiffs' Complaint Adequately Alleges a Strong Inference of Scienter

The Complaint adequately alleges a strong inference of scienter with particularized facts that reflect a substantial degree of intentional or conscious misconduct, i.e. deliberate recklessness. *See South Ferry*, 542 F.3d at 78; *see also Metzler*, 540 F.3d at 1066. (Scienter is adequately alleged when a complaint "contain[s] allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statement when made.").

### 1. The *Magnitude* of the Accounting Fraud Supports a Strong Inference of Scienter

"While scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP, significant violations of GAAP standards provide evidence of scienter so long as they are plead with particularity." *In re Daou Sys.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (citations omitted). Indeed, "when significant GAAP violations are described with

12

PLS.' CONSOLIDATED MEMORANDUM OF P&As IN OPP. TO DEFS.' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves." *Id.*, (quoting *In re McKesson HBOC, Inc., Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000)). Where a complaint describes with particularity: GAAP violations, the accounts that were restated, the time period, the amount of the adjustment, and if the adjustments involve relatively straightforward accounting principles and are of great magnitude, such adjustments may be evidence of a strong inference of scienter. *See Daou*, 411 F.3d at 1017-19;

Here, the Complaint identities the specific GAAP provisions and Company's stated accounting policies that were violated. These provisions are basic and straightforward provisions stating that revenue should be recorded when earned, when goods are shipped and risk of loss has passed to the buyer, or where collectability is reasonably assured. ¶¶63-81. The Complaint also identifies each of the statements that are false, the restatement adjustment, and the magnitude of the correction as compared to previously reported figures.

- Overstated its "record" revenue for Q4 2006 by $1,551,000, or 43%. FY 2006 net income before income taxes was overstated by $1,283,000 or by 425% and in Q4 2006 previously reported net income before income taxes of $778,000 was, in truth, a net loss before income taxes of $505,000;

- Overstated revenues for both the Q2 and six months ended June 30, 2007 by $7.6 million or 141% and 103%, respectively.  In truth, the originally reported net income before income taxes for Q2 2007 of $2,087,000 was really a net loss before income taxes of $4,714,000—a $6,801,000 or 144% understatement of loss; and the originally reported net income before income taxes of $1,840,000 for the six months ended Q2 2007 was in truth, a net loss of $4,961,000—a $6,801,000 or 137% understatement of net loss; and

- Overstated Q4 and FY 2007 revenue by $1,920,000, or 52%, and $7,970,000, or 56%, respectively, and to under-report net loss before income taxes for 2007 by $5,354,000 or 31%.

*E.g.,* ¶5. The overstatement figures for Q2 2007 and FY 2007 are even higher when one includes the additional restatement transaction from the October 20, 2009 10-K.  For example, revenue is now overstated in Q2 2007 and FY 2007 by 292% and 63%, respectively.

The magnitude of these restatements and their impact on NutraCea's restated financials demonstrate a strong inference of scienter. The *McKesson* Court found the same where "[t]he corrected accounting reveals that revenue inflation exceeded 25% in some quarters"--a negligible amount compared to NutraCea's overstatement of revenue by as much as 292% during the Class Period, and overstatement of net income or understatement of net loss by as much as 425%! 126 F. Supp. 2d at 1273.

The pervasive nature of the revenue recognition fraud is further demonstrated by the open and unresolved SEC Staff comments concerning the Company's revenue recognition practices on other undisclosed transactions. *See* Kim Decl., Ex. 1 at p. 37.[6]

Other courts follow this general rule. *See e.g. Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) ("the sizable impact on [the company]'s reported earnings of these alleged violations of GAAP also support an inference of scienter") (citing *Daou*, 411 F.3d at 1022); *In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791, at *4 (D. Ariz. Mar. 9, 2006) ("the

---

6  *See U.S. v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991), *cert. denied*, 502 U.S. 916, *overruled on other grounds by Wilson v. Williams*, 182 F.2d 562 (7th Cir. 1999)("Dean Wigmore's 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves; the recurrence of a similar result … tends to establish … the presence of the normal, i.e. criminal, intent accompanying such an act.") (quotation and citation omitted).

14

greater the magnitude of the restatement or GAAP violation, the more likely that such a restatement or violation was made consciously or recklessly"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (explaining that the magnitude of write-downs involved "renders less credible" defendants' argument that they acted without scienter); *Microstrategy*, 115 F. Supp. 2d at 636 (finding a strong inference of scienter where income was overstated by 290%); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506-07 (W.D. Pa. 2002) (income restated downward by 152% supported a strong inference of scienter*); Roth v. Aon Corp.*, 2008 WL 656069, at *7 (N.D. Ill. Mar. 7, 2008) (finding scienter established, in part, because of a 20% overstatement of income); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) ("The court finds that the magnitude of the restatement, in this case, significantly contributes to a finding of scienter").[7]

## 2.  Defendants' Departure From Their Own Publicly Announced Accounting Policies Support a Strong Inference of Scienter

Scienter may also be inferred from Defendants' departure from the Company's own publicly announced revenue recognition policy. A "reckless failure to follow an announced [expensing] policy" may satisfy the scienter prong. *Rothman*, 220 F.3d at 91; *see also In re Winstar Commc'ns*, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006) ("Other evidence that may be considered in

---

7  NutraCea's citation to *Reiger v. Price Waterhouse Coopers LLP*, 117 F.Supp.2d. 1003, 1013 (S.D. Cal. 2000) for the proposition that the magnitude of the restatement adjustments cannot provide evidence of scienter is off the mark.  *Reiger*, was issued five years prior to the Ninth Circuit's *Daou* holding where the Ninth Circuit explicitly held otherwise.  *Daou*, 411 F.3d at 1023. In any event, *Reiger* is distinguishable because it involved a case attempting to hold an *auditor* liable for a Company's alleged accounting fraud. *Id.*, at 1013. In any event, the *Reiger* decision was recently criticized in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1197 (C.D. Cal. 2008) (explaining that the *Reiger* decision's "remarkable deference" to auditors was "suspect.").

establishing scienter is [. . .] violations of the company's own internal policies for reporting revenue and earnings"). On each of the four large transactions, Defendants violated their stated accounting policies. ¶¶63-81. For example, on numerous occasions, Defendants publicly stated that "[r]evenues from product sales are recognized when products are shipped and when risk of loss has transferred to buyer. . . . and, in all instances, persuasive evidence of …. collectability, must be determined or accomplished…" ¶62. Yet, the Company admitted that it improperly recorded revenue when product had not been shipped, risk of loss had not passed to buyer, and/or where persuasive evidence of collectability was not present. For example, the Company admitted that there was no evidence of collectability when the revenue was recognized with respect to the $1.6 million Famous Discoveries transaction. *E.g.,* ¶18. Moreover, this transaction was a complete sham because the product was never shipped to NutraCea and risk of loss never passed to buyer because it was merely a consignment arrangement. *E.g.,* ¶19. The Company improperly recorded revenue for the $2 million ITV transaction, because the transaction did not meet the requirements for a "bill and hold" arrangement. Moreover, the transaction was fraudulent because NutraCea obtained a backdated letter from ITV in order to justify recording this transaction as revenue in Q4 and FY 2007. It was not until nearly five months after the Company reported their Q4 and FY 2007 results, did it disclose that it engaged in "bill and hold" arrangements in a August 11, 2008 SEC filing. Thus, the Company led investors to believe that it had not engaged in "bill and hold" arrangements in prior periods. Notably, the failure to disclose the "bill and hold" revenue recognition policy is itself a GAAP violation. ¶66-68, 71.

NutraCea also admitted that it failed to follow its own stated revenue recognition policy because it did not defer down-payments received for the sale of items that had not been shipped or were subject to conditions relating to the sale

that had not yet been substantially performed. ¶62. NutraCea improperly recorded revenue on the $2.6 million related loan transaction in Q2 2007 because there was no evidence of collectability. The transaction was a sham because it involved a secret undisclosed loan from a former officer of the Company that purportedly provided the $1 million loan to the purchaser for this transaction, the transaction was completely reversed with no indication that the revenue would later be recognized, and the inventory for that transaction was completely written off at zero value. ¶¶63-65. Deviating from a company's internal accounting policies in a way that violates GAAP is sufficient to create a strong inference of scienter. *See Provenz v. Miller*, 102 F. 3d 1478, 1490 (9th Cir. 1996) (denying summary judgment because failure to follow internal accounting policies indicates that GAAP violations are deliberate); *Pirraglia v. Novell, Inc.*, 339 F. 3d 1182, 1192 (10th Cir. 2003); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1458-59, n. 10 (N.D. Cal. 1996) (same, citing *Provenz*); *In re IMAX Sec. Litig.*, 587 F.Supp.2d 471, 483 (S.D.N.Y. 2008) ("the failure of . . . defendants to conform the financial results to [the company's] own publicly disclosed accounting policy" formed a basis to conclude that scienter had been adequately alleged).

### 3.  The Fraudulent Nature of the Transactions Support a Strong Inference of Scienter

Premature revenue recognition is the type of GAAP violation that gives rise to a strong inference of scienter because it is simple--money should not be counted as "in the bank" when it has not yet been received. *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *20-21 (E.D.N.Y. Sept. 19, 2005) (premature revenue recognition suggests a strong inference of scienter) (quoting *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000)); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 231-32 (S.D.N.Y. 2006).

Moreover, the actual substance of the four transactions demonstrate that Defendants either knew their statements about NutraCea's revenue and net income were false, or, at a minimum, recklessly disregarded the truth of the transactions:

**Famous Discoveries $1.6 million transaction**: This transaction involved the Company's improper recognition of $1.6 million in revenue in December 2006—at the very end of Q4 and FY 2006—which represented overstatements as high as 49% for revenue and 425% for net income for those periods. *E.g.,* ¶¶18-19, 5a. The Company initially admitted in its April 23, 2009 announcement that this transaction should have been reversed in 2006—rather than in 2007. *E.g.,* ¶¶127, 13, 16. The Company stated that the $1.6 million sale should not have been recorded in Q4 2006 because there was insufficient evidence that Famous Discoveries had the ability to pay for the goods, that NutraCea was inexperienced in the infomercial market to understand the distribution channel, and the fluctuating nature of sales into this channel or the potential for product return. *E.g.,* ¶17.

This purported sale on credit of $1.6 million of Dr. Vetz PetFlex product to Famous Discoveries was in fact a sham consignment arrangement and should not have been recognized as revenue at all, as such recognition violated GAAP and the Company's own internal accounting policies. *E.g.,* ¶¶18-19, 72-74. The actual product was never delivered to Famous Discoveries' warehouses, and Famous Discoveries had no obligation to purchase this product from NutraCea unless and until Famous Discoveries obtained a firm purchase order from its customers or had been paid. If Famous Discoveries was unable to sell the product, it had no liability to purchase it from NutraCea. Under the most elementary application of GAAP, such a consignment sale was not revenue that can be recorded because it was not earned and risk of loss had not passed to Famous Discoveries. ¶¶75-79. Famous Discoveries' senior executives stated that Famous Discoveries negotiated the

1    consignment sale transaction with Edson, including the terms. Therefore, Edson

2    knew it was a consignment arrangement. ¶¶76, 78, 139.

3        The most plausible inference from the $1.6 million transaction is one of

4    fraud or recklessness rather than an innocent mistake. This transaction helped

5    NutraCea achieve "record" revenue and earnings. ¶¶83-84. This transaction

6    overstated revenue for Q4 and FY 2006 as high as 43% and earnings for those

7    periods as high as 425%. ¶61c. Courts have long found such consignment-type

8    sales booked as revenue strongly indicative of fraud. *See Sirota v. Solitron*

9    *Devices, Inc.*, 673 F.2d 566, 572-76 (2d Cir.) (holding defendants liable for

10   securities fraud because they reported consignment transactions as sales), *cert.*

11   *denied*, 459 U.S. 838 (1982); *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962,

12   970-71 (E.D.N.Y. 1988) (explaining that it is a "fraudulent practice [ ]" to treat as

13   sales "[t]ransactions that were really consignments."); *see also Makor Issues &*

14   *Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("Channel stuffing

15   becomes a form of fraud only when it is used as the complaint alleges, to book

16   revenues on the basis of goods shipped but not really sold because the buyer can

17   return them. They are in effect sales on consignment, and such sales cannot be

18   booked as revenue. Neither condition of revenue recognition has been fulfilled-

19   ownership and its attendant risks have not been transferred, and since the goods

20   might not even be sold, there can be no certainty of getting paid.") (emphasis

21   added) (internal quotation marks omitted).

22       The Complaint also demonstrates that the Company's purported excuse for

23   this restatement was false and misleading because Defendants knew that Famous

24   Discoveries was unwilling to take on large amount of debt or inventory, as it was

25   contrary to its business practice and intent, and because contrary to Defendants'

26   proffered explanation for the GAAP violation, NutraCea actually had extensive

27   experience in infomercial sales. ¶87.  *See Carlson v. Xerox*, 392 F.Supp.2d 267,

28

285 (D. Conn. 2005) ("Exculpatory statements, when should to be false, are circumstantial evidence of guilty consciousness and have independent probative force.") (quoting *SEC v. Grossman*, 1987 U.S. Dist. LEXIS 1666, at 34 (S.D.N.Y. Feb. 17, 1987)).

Defendants erroneously argue that the false statements concerning the $1.6 million transaction is merely an issue of timing. This transaction is not a timing issue. As Defendants admit, the transaction should have been reversed in 2006—not that it should have been recorded later. ¶18. In any event, none of the cases cited by Defendants in this regard hold that if a Company knowingly or recklessly records revenue in the wrong reporting period, that an inference of scienter is negated purely based on the fact the conduct related to the timing of when revenue was recorded.[8]

**$2.6 million related loan transaction**: The $2.6 million in revenue recorded in Q2 2007 in connection with the purported sale of Dr. Vetz PetFlex product was a sham. The purchaser's down payment was provided through a secret $1 million loan made to the purchaser by a person who at the time was a consultant to, and former officer of, NutraCea. ¶9. This person is believed to be NutraCea's former COO Ike Lynch as he is the only person that fits the description. ¶149. The loan, and its related party nature, were concealed from the Company's auditors and never disclosed publicly by the Company. ¶9. In the February 23, 2009 announcement, the Company admitted that the entire $2.6

---

8  *Hypercom*, 2006 WL 726791, *4 is inapposite.  While the *Hypercom* court analyzes whether the complaint sufficiently pleads scienter over the course of many pages, 2006 WL 726791, at *3-10, only in passing, without explanation does it state in one mere sentence: "[f]urthermore, Hypercom still received the revenue at issue-it only changed the period in which the revenue was recorded." *Id.* at *4. Here, NutraCea never actually received the "revenue-at issue" ¶¶74-79, 16. In any event, while the timing of revenue recognition may be a factor in weighing inferences depending on specific circumstances which vary from case to case, it is obviously not dispositive.

million should not have been recognized as revenue and that the evidence relied upon by the Company to determine the purchaser's ability to pay the $1.6 million balance was false. ¶¶9, 98. Moreover, the transaction is further indicative of a sham because in reversing the transaction the Company simultaneously credited and debited the line item of cost of goods sold by $557,000 for this $2.6 million sale. Effectively, the inventory associated with this purported sale was accounted for as being worthless and wiped clean from NutraCea's books along with the $2.6 million in revenue. ¶98.

Both Crow and Edson knew the true details of the $2.6 million transaction and/or closely monitored the Company's other major revenue transactions. With respect to Edson, in the Q1 2007 press release, Edson stated that the Company did not meet its projected revenue for Q1 2007 because of issues relating timing and that $2.6 million in sales would be recognized in Q2 2007. ¶¶92-93. During the Q1 2007 conference call, Edson also explicitly acknowledged to investors that he knew the importance of revenue recognition and that he intensively worked with the Company's auditors. Edson stated in relevant part:

> Well, I think it's an unfortunate issue, and, ah, really caught us off-guard. I, I will tell you that I take these things very seriously. **I had intense discussions with our auditors, and I'm gonna do everything that I can with our accounting staff to make sure that our paperwork on orders, ah will comply with all of the rules and regulations so that we don't have a recognition issue, uh, because we obviously wanna book all the revenue we can in the quarter that we expended the aeh, the time and the effort and the money, so we're gonna do everything we can. I understand the importance of it, uhm, you know, people make mistakes, but I will tell you I usually don't make a mistake twice.**

¶95.

During the same call, Edson also falsely reassured investors that there would be no issues with respect to purchase orders in the future and revenue recognition in the future.

> ….What I will assure you is that in conjunction with our accountants, we now are very clear on what our purchase orders will state, so that there won't be any in the future, any of these revenue recognition items because of some of these intricacies of the accounting rules.

¶96.

Crow's knowledge of the improperly recorded $2.6 million transaction and his monitoring of the Company's other major transactions is demonstrated by his comments during the Company's Q3 2007 conference call where he stated that the $800,000 reserve taken on this transaction resulted from a "slow paying" customer. ¶¶105, 150.

**$5 million round trip transaction**: The $5.0 million license fee that was recorded as revenue in Q2 2007 is strongly indicative of scienter because it was a sham "round-trip" transaction that never should have been recorded. According to NutraCea's 8-K filed April 23, 2009, PAHL ultimately paid the $5.0 million license fee to NutraCea in March 2008, and NutraCea immediately paid the same $5.0 million to another company controlled by FFOL, the same principal shareholder that controls PAHL. When PAHL paid the $5 million to NutraCea for a license to market and distribute certain products, contemporaneously, a NutraCea subsidiary, Medan LLC, purchased $10.675 million of capital stock of an Indonesian company from FFOL in two transactions ($8.175 and $2.5 million). NutraCea then recorded the value of the stock on its balance sheet at $10.675 million. As part of the restatement, NutraCea was forced to write-down the value of the second stock purchase from $8.175 million to $3.175 million and reverse the license fee revenue it recorded because $5.0 million of the purchase price was immediately returned to it. ¶¶ 81, 20-21. In effect, the license fee revenue

transaction was a cashless round-trip transaction. NutraCea even admitted the same in the April 23 announcement: "the Company now believes the First Purchase of the PIN shares [from FFOL] and the payment of the License Fee should be viewed as a combined event with related parties." ¶¶127, 141.

Moreover, it is not plausible that Edson and Crow did not know the true details of these transactions or the proper accounting treatment. This transaction, along with the $2.6 million related loan transaction, allowed NutraCea to overstate Q2 2007 revenue by 141% or $7.6 million and turned Q2 2007 net loss of $4.7 million to a profit of $2 million. ¶104.  This conclusion is further bolstered by the fact that Q2 2007 was in fact overstated by 292% per the Company's October 20, 2009 10-K.  Kim Decl., Ex. 1 p. F-67.

**ITV $2 million "bill and hold" transaction**: The $2 million in revenue the Company recorded in Q4 and FY 2007 in connection with its sale of $2 million RiceNShine product to ITV supports a strong inference of scienter. The Company's February 23, 2009 announcement revealed that the revenue should not have been recognized in December 2007 but in later quarters because the transaction occurred on a "bill and hold" basis and that the transaction did not meet the requirements for revenue recognition in December 2007. ¶¶10-11, 112.

A "bill and hold" arrangement occurs when a seller charges a buyer for products but retains possession of the goods until they are shipped at a later date. Pursuant to GAAP, revenue is generally recognized under these arrangements when it is specifically requested by the purchaser, when goods are shipped to the buyer or to a designated location selected by the buyer and the other elements of revenue recognition are satisfied, including among other things, the risk of loss has passed to the buyer and collectability is reasonably assured. ¶¶11, 60.

Here, too, Defendants whimsically argue that because the $2 million "bill and hold" transaction was merely an issue of when the revenue would be

recognized, the inference of scienter is undermined. Defendants' argument once again does not add up. The question is not merely whether Defendants were motivated to lie about earning revenue from the "bill and hold" transaction, but whether Defendants knew that they did not earn the revenue when they falsely stated they did. Indeed, how could Defendants not be aware of the most basic aspects of the $2 million transaction considering that ITV, accounted for a nearly half of the Company's sales revenue, at its peak,  during the Class Period? ¶3. The $2 million transaction to ITV allowed the Company overstate Q4 2007 revenue by nearly 52%. Moreover, this sale took place in December 2007 on the eve of the end of NutraCea's quarter and fiscal year ended December 31, 2007. ¶112. To suggest that Defendants did not know the "bill and hold" nature this of transaction is simply implausible.  This conclusion is further bolstered by the fact that all sales to ITV were closely monitored by the Company during the Class Period because NutraCea was obligated to pay commissions on those sales to NutraCea founder and former CEO Patricia McPeak. ¶137.

### 4.  The Confidential Witness Allegations Demonstrate a Strong Inference of Scienter

"[C]onfidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 981.

> First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.

*Id.* (quotations and citations omitted) (emphasis added). The first prong can be satisfied in the following ways. "Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an

adequate basis for believing that the defendants' statements were false." *Id.* When such additional evidence is absent, "confidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* "To determine whether the complaint has done so, a court is to look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

### i.        CW1 and CW2

Defendants do not challenge the allegations of CW1 or CW2 on the basis that the Complaint does not describe with particularity facts demonstrating their reliability or personal knowledge of the facts alleged, nor could they. CW1 is the CEO and a founder of Famous Discoveries NutraCea's customer for the Q4 2006 $1.6 million transaction that was improperly recorded as revenue. ¶74. CW1 negotiated with Edson the terms of purported $1.6 million sale of Dr. VetzPet Flex products in the infomercial markets. ¶¶47, 74. CW2 is founder and President of Famous Discoveries, and was also involved in negotiations with Edson concerning the $1.6 million transaction. ¶48. CW2 corroborated CW1's account that CW1 was primarily involved in negotiating the $1.6 million transaction on behalf of Famous Discoveries with Edson.

CW1 and CW2's allegations support a strong inference of scienter because the allegations conclusively establish that the $1.6 million transaction was a complete sham and should not have been recognized as revenue. Contrary to Company's representations that this transaction was a sale on credit, the transaction was a consignment transaction that did not require Famous Discoveries to purchase Dr. Vetz PetFlex products. ¶¶19, 79. The arrangement merely allowed

Famous Discoveries to market NutraCea products in an effort to obtain firm purchase orders from its customers. ¶74. Indeed, none of the Dr. Vetz PetFlex products were ever shipped to Famous Discoveries. *Id.* CW1 stated the transaction was "no risk" because Famous Discoveries had no obligation to purchase the product if Famous Discoveries could not sell the product. ¶75. Under even the most elementary application of GAAP, a consignment arrangement is not revenue that is "earned."

These allegations also demonstrate a strong inference of scienter as to Edson and Crow. As to Edson, the allegations conclusively establish that Edson knew the true details of the transaction because he actually negotiated it with CW1 and CW2. ¶¶76, 78. Moreover, is not plausible to believe that Edson mistakenly believed that this consignment arrangement could be recorded as revenue because Famous Discoveries had "no risk" and was not obligated to buy the product, the product was not shipped, and Edson was aware of Famous Discoveries business practice of not taking on inventory or debt. ¶¶75, 79. Nor is it plausible to believe that Edson did not know this transaction was recorded as revenue for Q4 2006. The transaction occurred in December of 2006 (NutraCea's fiscal year ended December 31, 2006) and the transaction enabled to the Company to post "record" results for Q4 2006 and FY 2006, and accounted for nearly half of the Company's revenues for Q4 2006 and turned Q4 2006 results from a net loss to a profit. ¶¶83. Indeed, in commenting on the results, Edson touted the "record" results and the Company's "first full year of profitability." ¶84.

Likewise, based on the magnitude and timing of the sale, Crow as CFO certainly knew the details of the transaction when the revenue was improperly recorded. The sale occurred and was recorded in December 2006. At that time, Crow would have been busy preparing for the Company's internal audit. The transaction accounted for nearly half of the Q4 2006 revenue and turned Q4 2006

from a profit to a loss. ¶86. It is implausible to believe that Crow would not have known of the details of the Famous Discoveries transaction or the proper accounting treatment for a consignment sale under these circumstances.[9]

### ii.  CW3

CW3's allegations concerning the $2 million "bill and hold" sale in Q4 2007 are adequate. Contrary to Edson's argument, Plaintiffs need not allege CW3's title or background with particularity, because the allegations based on CW3's knowledge are corroborated by other documentary evidence. *See Zucco*, 552 F.3d at 981 ("Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false").

CW3 is a percipient witness who, in June of 2008,[10] personally spoke to Robert Maihos, an officer and director and control person of ITV.[11]¶¶ 49, 68c. The particularized facts about Mr. Maihos and ITV—one of NutraCea's largest customers (¶10)—show that CW3's account is reliable and accurate. These allegations include the quantity of product involved (even serving size), when the order was placed, the name of NutraCea's co-packer, when the orders were received by ITV, ITV's general business plan, and the like. ¶¶67-68. None of

---

9   Edson's reliance on *Weiss v. Amkor Tech., Inc.*, 527 F.Supp.2d 938, 948 (D. Ariz. 2007) is misplaced. *Amkor* dealt with confidential witnesses, some of whom were not even employed by the company during the relevant time period.  *Id.*, at 954.  Moreover, the allegations from the confidential witnesses "merely reflect[ed] matters that companies deal with on a daily basis" and "unsupported vague conclusions." *Id.* The confidential witnesses were also low level employees of the company proffered to submit the knowledge of higher level management. *Id.*

10   The telephone call took place in June 2008. ¶68c. Elsewhere in the Complaint, the Complaint mistakenly refers to the call taking place in June 2006. ¶67.

11   ITV, ITV Direct and Direct Marketing Concepts were affiliates of each other, shared the same office address, and had overlapping management.

27

PLS.' CONSOLIDATED MEMORANDUM OF P&As IN OPP. TO DEFS.' MOTIONS TO DISMISS THE FIRST
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

these facts are disputed by the Defendants. Moreover, CW3's account is also independently corroborated by the February 22, 2008 document posted on the Internet on an ITV related website which supports CW3's account that ITV had no business reason to request a "bill and hold" arrangement with NutraCea because such an arrangement would hurt ITV's ability to "up-sell" product on expedited shipments to customers. ¶68f, *cf.* ¶69.

CW3 allegations demonstrate a strong inference of scienter because Mr. Maihos personally admitted to CW3 that NutraCea fraudulently requested Mr. Maihos sign and backdate a letter to justify the "bill and hold" arrangement. ¶68d. This request was made not once, but twice. ¶68e. Following the second request in February 2008, Mr. Maihos executed the fraudulent bill and letter and backdated it upon NutraCea's request in order to justify recognition of revenue on the "bill and hold" transaction. ¶68e.

Crow argues that these allegations do not support a strong inference of scienter as to him because there is no mention of him. Stated differently, Crow would have the Court believe that the Company's CFO did not know the details of the transaction. Given that the transaction was with one of NutraCea's largest customers, amounting to nearly 52% of the Q4 2007 revenue, and the transaction occurred and was recorded at very end of the quarter further overwhelm any competing inference and conclusively demonstrate fraudulent intent.

### 5.   Under *South Ferry* and its Progeny, Each Defendant Knowingly or Recklessly Made Misstatements

Defendants' primary argument is that the Complaint fails to allege specifically how Edson or Crow knew that their statements about the Company's revenue recognition and net income were false. Preliminarily, the following category of allegations, highlighted above, considered holistically demonstrate

that Defendants knew or should have known that their statements were false because of:

- the magnitude of the restatements;

- the violations of straightforward GAAP and Company accounting policies;

- the nature and timing of the transactions, i.e. three of transactions are indicative of sham transactions, the fourth transaction involved a fraudulent "bill and hold" letter, and that transactions occurred and were recorded near the end of the reporting periods and achieved "record" results;

- Edson and Crow's false reassurances;

- NutraCea's admissions in the October 20, 2009 10-K that states that restatement was the result of "withholding information" and "providing false explanations" to the Company's Board, Audit Committee and auditors and the statement that the *behavior* of Senior Management resulted in this conduct. *See* Kim Decl., Ex. 1, p. 72-73; and

- Edson and Crow's promised (but failed) remediation plan in the 2007 10-K concerning larger revenue transactions.  *See* Kim Decl., Ex. 2 at p. 36-38.

Even if the Court finds these allegations do not adequately show Edson and Crow's scienter, the Court should deny the motions to dismiss because it may consider these allegations together with the "core-operations" inference: "it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers. . ." *South Ferry,* 542 F.3d at 781. The Ninth Circuit explained that although previous Ninth Circuit cases and their progeny, which Defendants erroneously rely on, rejected reliance on the core-operations inference, the Ninth Circuit now accepts it:

> The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon Graphics*, *Vantive*, and *Read-Rite* notwithstanding. Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter. *See* 127 S.Ct. at 2511 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis.

*Id.* at 784. The Court should make the core-operations inference because it would be *absurd* to believe that Crow or Edson did not know the true details of the these transactions or the simple accounting rules that should have been applied, *i.e.* revenue is not be recorded on consignment sales, revenue is to be recorded when earned, revenue is to be recorded when product is shipped and risk of loss has passed, and when the customer has the ability to pay.

During the Class Period NutraCea was a small company and a majority of the Company's sales and revenue were derived from a handful of customers. ¶2. The restatements concern revenue earned from NutraCea's small number of customers, which make up the majority of its sales, and where the overstatements were by as much as 292% and 425%, the circumstances are sufficiently unusual that, even were there no other allegations inferring scienter, under *South Ferry* the motions to dismiss must be denied.  ." *South Ferry*, 542 F.3d at 785 ("in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA.").

### 6.  Additional Scienter Allegations

The Offering: Defendants were also motivated to overstate revenue in order to inflate the Company's stock price for the purpose of making its private offering of stock and warrants at an artificially high price. The Company received gross proceeds of $20 million through a private stock offering that closed on April 30,

30

2008. The offering was commenced and completed only a few weeks after the Company filed its materially false and misleading Q4 and FY 2007 results with the SEC on March 17, 2007. Significantly, the Company had inflated FY 2007 revenue by 63%[12] and understated net loss by 31%. ¶142b. Defendants' motive to inflate the Company's Stock price in order to hold the offering at a higher price supports a strong inference of scienter. *See Daou*, 411 F.3d at 1023-24 (the company "acquired 11 companies by exchanging over 6.6 million shares of . . . [its artificially inflated] stock. . . . When considered as a whole, plaintiffs' allegations are sufficient to create a strong inference that all defendants except Moragne acted with at least deliberate recklessness"); *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (allegation that CEO and chairman of the board had motive to inflate sales to raise financing for company is probative of scienter); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269-70 (2d Cir. 1993) (upholding allegation that officers were motivated to conceal "consideration of [a] rights offering to maintain a high stock price prior to announcement of the new rights offering in order to lessen the dilutive effect").   Moreover, because Edson successfully completed NutraCea's $20 million stock offering and an additional related preferred stock offering, he was awarded an unusually large cash bonus. Edson was also awarded an additional $70,000 bonus in November of 2008.  *See* Kim Decl., Ex. 1 at p. 80.

Edson's Compensation: Edson was motivated to overstate the company's revenue in order to complete the stock offering and receive the bonus of $280,000 in cash that he was awarded on April 25, 2008 (and related $70,000 bonus awarded in November 2008), only a few weeks after the Company filed its materially false and misleading Q4 and FY 2007 results (which overstated by

---

12   *See* Kim Decl., Ex. 1, at p. 9.

revenue by 52% and 56%, respectively) with the SEC on March 17, 2008. This cash bonus exceeded his salary for 2007 of $255,769. According to the Company's proxy statements filed during the Class Period, the Company did not ordinarily pay cash bonuses. ¶142c. In the Ninth Circuit when unusual bonuses are received, a strong inference of scienter can be inferred. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp*, 320 F.3d 920, 944 (9th Cir. 2008) ("none of the [defendant's] executive officers received options awards in 1997 . . . [but defendant] awarded [thousands of options to executive officers] in March 1998 [for performance allegedly increased by misrepresentations] . . . a strong inference of scienter can be inferred from Plaintiffs' allegations"); *Tellabs*, 551 U.S. at 311 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference"). This allegation, when viewed together with the other allegations in the Complaint, is another piece in the scienter puzzle.

Employee Departures: Edson's purported "resignation" supports an inference of scienter because he was forced to resign in the wake of the accounting fraud. The Court merely has to look at his severance package to determine that Edson was forced out of the Company because he forewent over $410,000 in cash compensation by "resigning" and potentially an additional $550,000 in bonuses had he been terminated without cause or resigned with good reason. ¶147f. It is illogical to believe that Edson would have left almost $1.0 million of cash compensation on the table by voluntarily resigning – unless he was really forced to resign under threat of termination and complete loss of any severance payment. Moreover, the musical chairs at the CFO position and Crow's resignation also support an inference of scienter. During the Class Period, two replacement CFOs either resigned or refused to start all before they were required to sign the Company's financial statements and Sarbanes-Oxley certifications. Likewise,

Crow's ultimate successor Olga Hernandez-Longan, also "resigned" effective July 31, 2009—without having to sign any financial statements or Sarbanes-Oxley certifications or financial statements. ¶148. These allegations add another piece to the scienter puzzle. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F.Supp.2d 964, 975-76 (N.D. Cal. 2009) ("Although proximate resignations of high-ranking officers or directors do not alone support scienter, 'when corporate reshuffling occurs in tandem of financial restatements, these changes add one more piece to the scienter puzzle.'") (quoting *In re Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS, at * 26- *27 (N.D. Cal. Jul. 18, 2007).

SEC Investigation: The SEC's formal investigation of the Company supports a strong inference of scienter. The Company admitted that the investigation focuses specifically on the transactions that are the subject of the restatement and that form the basis of the securities fraud claims herein. *See In re Syncor Intern. Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004). Indeed, the Ninth Circuit considers administrative investigations and settlements in determining scienter. *America West*, 320 F.3d at 942.[13]

Sarbanes-Oxley Certifications (SOX): That Edson and Crow signed and separately certified pursuant to SOX the 10-Ks for FY 2006 and FY 2007 and 10-Qs for Q1 and Q3 2007 also supports a strong inference of scienter because both Edson and Crow attested to the accuracy of the financial statements, when in fact, they were aware or should have been aware of sham transactions as detailed above. Under these circumstances, the SOX certifications support an inference of

---

13  Defendants incorrectly rely on *In re Business Objects S.A. Sec. Litig.*, in which the court found that an SEC investigation did not infer scienter because the complaint did not even allege GAAP violations, but only "the existence of a 'risk' . . . [of] GAAP violations . . ." 2005 WL 1787860, *7 (N.D. Cal. July 27, 2005). They also incorrectly rely on a pre-*South Ferry* decision, *In re Hansen Natural Corp. Sec. Litig.*, which found that the mere existence of an SEC investigation, where there was no other evidence of wrongdoing, does not infer scienter. 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007).

scienter. *See In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 WL 538756, at *17-18 (D. Or. Jan. 3, 2006) (knowledge of management override of controls evidences scienter where management signed SOX certifications certifying controls were adequate); *In re OCA, Inc. Sec. and Deriv. Litig.*, 2006 WL 3747560, at *22 (E.D. La. Dec. 14, 2006) (SOX certifications when combined with other allegations of scienter create strong inference).[14]

Edson's Stock Transactions: Edson's suggestion that because he bought 79,000 shares for about $40,000 six months before any restatement was announced undermines any inference of scienter is ridiculous. While the Court can take judicial notice that Edson filed Form 4s with the SEC, the Court cannot take judicial notice of the truth of the matters asserted therein, *i.e.* the forms actually represent all of Edson's transactions in NutraCea stock during the Class Period. *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at * 2 (N.D. Cal. Dec. 4, 2008)

---

14   Defendant Crow also argues that because NutraCea's auditors made a "clean audit opinion," an inference of scienter is negated, yet cites no facts about the audit opinion that negates his inference of scienter. Thus the argument is without merit. *See In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) (finding clean audit opinion does not negate inference of scienter because: "The Officer Defendants do not point to specific references in the KPMG audit opinion that bear on their alleged recklessness in making statements regarding loan quality or underwriting."). Here, the accounting fraud involved manipulation of facts. For example, the related party nature of the $2.6 million transaction was "concealed" from the auditors, the Famous Discoveries transaction was a hidden consignment arrangement, and there was a fraudulent "bill and hold" letter for ITV transaction. Likewise, the Crow and Edson issued false reassurances to the investing public. *See Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1314, n. 13 (C.D. Cal. 1996) ("the fact that [the] independent auditor may have approved the accounting methods will not shield [the officers] from liability for deception such methods may have caused."). Crow cites *Hansen Natural Corp.*, 527 F.Supp.2d at 1158, however, the case is inapposite because plaintiff "failed to include 'the approximate amount by which revenues and earnings were overstated, ... provide[d] the dates of some of the related transactions and the ... company employees involved in the transactions.'" *Id.* Moreover, Crow's citation to *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1166 (C.D. Cal. 2007) does not save him because this case *does* involve "a case where Defendants used fraudulent accounting to portray a failing company as a profitable one."

34

(collecting cases). Any competing of inference of nonculpability that can be drawn from Edson's Form 4s are fully negated by the fact that Edson had failed to disclose that he received 1 million shares of Company stock in July 14, 2004. It was not until September 17, 2007, following revelation of the undisclosed grant was aired on an internet message board, was it disclosed that the stock was transferred to Edson's family members. At no time did, Edson or NutraCea disclose whether that stock was ever sold by the Edson's family members. ¶144-45.[15] Thus, Edson's reliance on his Form 4s does not establish that he or his family members were net purchasers of NutraCea stock during the Class Period.

Moreover, Edson's suggested inference of nonculpability is further undermined by his refusal to disclose to the Company his actual beneficial ownership in the Company's stock. Indeed, in footnote in the October 20, 2009 10-K, the Company states that Edson's "requested [ownership] information was **_never_** furnished by individual." *See* Kim Decl., Ex. 1 at p. 104. (emphasis added).

### 7. Defendants Are Not Saved by *Zucco Partners v. Digimarc*

Defendants rely heavily on *Zucco*, to suggest that this case is analogous to it. However, *Zucco* distinguishable on the facts. *Zucco* involved a restatement relating to "accounting for costs of internal software development" which the Ninth Circuit explained was "not a simple task." *Id.*, at 987. Additionally, the *Zucco* restatement also did "not concern especially prominent facts" because it concerned "certain costs [that] had been erroneously capitalized because either a portion of such costs did not qualify for capitalization …" *Id.*, at 1001. Here, the accounting involved much simpler rules regarding revenue recognition, i.e., was the revenue earned, was the product shipped with risk of loss passing to the buyer, was the transaction a consignment arrangement as opposed to a sale on credit, and

---

15  The 79,000 shares at that were allegedly bought is mere pittance to the profits Edson's "family members" would have reaped on a million shares.

was the transaction a "bill and hold" transaction or not.   Moreover, the adjustments in this case were huge.

Moreover, the confidential witness statements in *Zucco* were of lower level employees of the issuer which included "vague [multiple level] hearsay" to establish knowledge on higher level management. *Id.*, at 997-98. The court also explained noted that certain confidential witness statements "too conclusory" and that certain allegations were contradictory. *Id.*, at 998 ("CW6 claims that Ranjit 'had to have known what was going on with respect to the Company's inventory manipulation,…'"). This is simply not the case here, as noted above, CW1 and CW2 actually negotiated the consignment transaction with Edson. Likewise, CW3 was a percipient witness that had a telephone call with Robert Maihos an owner and control person of ITV. As detailed above, the CW accounts are not contradictory, rather they are plausible and are corroborated by other evidence alleged in the Complaint.

## C. The Complaint Adequately Alleges Loss Causation

Loss causation is the casual connection between the alleged misstatement or omission, and a plaintiff's alleged loss. *Dura Pharms.*, 544 U.S.at 342. "To adequately plead loss causation, a plaintiff must allege a causal connection between the defendant's material misrepresentation and the plaintiff's loss, that is, the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. *UTStarcom,* 617 F.Supp.2d at 976 (quotation and citation omitted); *Metzler*, 540 F.3d at 1063. *Dura* does not require a fact-for-fact disclosure of the fraud in order to adequately plead loss causation, or mandate that the revelation of the fraud take a particular form. *Johnson v. Alijan*, 257 F.R.D. 587, 593 (C.D. Cal. 2009) (quotation and citations omitted). Rather, the complaint "'must allege … that the subject of the fraudulent statement or omission was the cause of the actual loss.'" *UTStarcom*, 617 F.Supp.2d at 976 (quoting *Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d

Cir. 2005)). "[L]oss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." *Apollo*, 633 F.Supp.2d at 823 (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d 247, 283 (S.D.N.Y. 2008)); *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 231 (5th Cir. 2009) (explaining that if a "complete" disclosure of the fraud were required, defendants could immunize themselves through a series of partial disclosures) (Sandra Day O'Connor (ret.) sitting by designation).

"[N]ormally it is inappropriate to rule on loss causation at the pleading stage" because it is critical at the proof stage and should be decided at trial. *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quotation and citations omitted). Loss causation allegations are governed by the notice pleading requirements for Rule 8(a)(2) and are not subject to any heightened pleading requirement under Rule 9(b) or the PSLRA. *Metzler*, 540 F.3d at 1062 (citing *Dura*, 544 U.S. at 346)). At the pleading stage, "[s]o long as the complaint alleged facts that, if taken as true, plausibly establish loss causation, a Rule12(b)(6) dismissal is inappropriate." *Gilead*, 536 F.3d at 1057. "A well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quoting *Twombly*, 550 U.S. at 556)). The Ninth Circuit explained that the pleading requirement is not a probability requirement, but only requires enough fact to raise a reasonable expectation that discovery will reveal evidence of loss. *Id.*; *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009) ("plaintiff is only required to plead a plausible cause of action; we are not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA"). Moreover, to demonstrate loss

causation "[a] plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value…" *Daou*, 411 F.3d at 1025 (quotation and citation omitted).

The Company's initial disclosure of the accounting fraud through the February 23, 2009 announcement caused the stock price to drop – evidencing loss causation. The announcement concerned the subject matter of the fraud, i.e., revealing details of improper revenue recognition practices which caused a substantial decline in the Company's stock price. In the announcement, the Company revealed: (1) an ongoing internal investigation being conducted by the Audit Committee through outside counsel and forensic accountants: (2) the Company's financial statements for FY 2007 and Q2-Q4 2007 and the quarters for 2008 should no longer be relied upon and had to be restated; (3) specific restatement adjustments for the $2.6 million transaction and the $2.0 million "bill and hold" transaction; (4) an informal SEC inquiry and request for production of documents "relating to a number of transactions, including the transactions [that are being restated]"; and (5) "[f]urther investigation and assessment may result in additional matters that require restatement for the periods referenced …, or for additional fiscal periods." ¶¶120-126. This announcement caused the Company's Stock to fall 17% on February 23, 2009 and to fall a further 14% the following day. ¶125. These facts plausibly demonstrate loss causation for the alleged accounting fraud.

The *Apollo* decision is instructive. The Court held that loss causation was adequately alleged with respect to the alleged options backdating scheme through a partial disclosure which was less precise and open-ended than the one in this case. 633 F.Supp.2d at 822-824. There, a disclosure stated "various deficiencies" were identified in connection with the issuer stock option granting practices, but the announcement stated that a "restatement might be possible." *Id.* Defendants

argued that the disclosure was not a revelation of the fraud because there was no restatement, which would have been indicative of fraudulent options backdating. The Court found loss causation was adequately alleged because the disclosure was a partial revelation of the fraud. *Id.*

Here, the partial disclosure of the accounting fraud, i.e., improper revenue recognition is more specific and actually definitive as to certain transactions. As explained above, the announcement states the Company's financial statements filed with the SEC and other public announcements for Q2-Q4 and FY 2007 and Q1-Q3 2008 should not be relied upon and had to be restated. The announcement actually sets forth specific adjustments for the $1.6 million and $2.6 million transactions.

Defendants argue there is no loss causation with respect to the April 23, 2009 press announcement that revealed additional accounting errors with respect to two transactions (the $1.6 million and $5 million transactions) because the Company's stock did not fall. This argument is without merit. The lack of a stock drop from the April 23 announcement does not demonstrate lack of loss causation for the accounting fraud. While the announcement revealed two other revenue transactions that had to be restated and added FY 2006 and Q1 2007 to the list of financial statements that should not be relied upon and which would be restated, the lack of a stock drop following this announcement merely shows that the market had already priced into the value of NutraCea stock on February 23, 2009 (the first disclosure) the expectation that additional accounting adjustments would be required. Indeed, the February 23rd announcement had warned that "[f]urther investigation and assessment may result in additional matters that require restatement for the periods referenced …, or for additional fiscal periods." ¶123.

*In re Bradley Pharmaceuticals, Inc. Sec. Litig.*, 421 F.Supp.2d 822 (D.N.J. 2006) is also instructive. There, plaintiffs alleged that the company made

misstatements about a sham sales transaction. Plaintiffs alleged a partial revelation through an announcement of a SEC investigation into the company's revenue recognition and other accounting issues. Defendants argued that because the company's stock price did not fall when the actual restatement of the company's financial statements were issued, there was no loss causation. *Id.* at 827-829. The court rejected this argument because the market activity between the times of the SEC investigation disclosure and the restatement announcement indicated that the market had already corrected the company's stock price from the SEC announcement. Here, like *Bradley*, there was a significant market reaction to an alleged partial corrective disclosure. On February 23, 2009, when the announcement was issued, the Company's Stock traded over 1.9 million shares, and the Company's Stock fell 17%. The following day, the Company's Stock fell another 13.8% and traded over 1.3 million shares.  *See* Kim Decl., Ex. 3.[16] Like *Bradley*, on April 23, 2009 when additional details of the fraud was announced (after market-close) NutraCea's Stock volume merely moved from 299,600 shares traded on April 23 to 310,600 shares traded on April 24. While NutraCea Stock rose from $.20 to $.22 on April 24, the next trading day the price of the Stock went down $.20. *Id.*   Thus, like in *Bradley*, NutraCea's volume and price movement on April 23 does not preclude loss causation to the alleged misstatements in this case. *See also In re Seitel, Inc. Sec. Litig.*, 447 F.Supp.2d 693, 712 (S.D. Tex. 2006) (rejecting argument that stock price increase when restatement adjustments were issued, as a matter of law, precludes a finding of loss causation as to revenue and earnings accounting fraud under *Dura* ); *In re Motorola Sec. Litig.*, 505 F.Supp.2d 501, 540 (N.D. Ill. 2007).

### D. The Complaint Adequately Alleges Reliance

---

16   The Court can take judicial notice of publicly reported stock prices and volume of the issuer's stock.  *See  Metzler*, 540 F.3d at 1064, n. 7.

1   Plaintiffs rely on the fraud-on-the-market presumption of reliance under

2   *Basic v. Levinson*, 485 U.S. 224, 243-49 (1988). This presumption is based on the

3   assumption that "[a]n investor who buys or sells stock at the price set by the

4   market does so in reliance on the integrity of that price." *Id.* at 247. Thus,

5   misleading statements will defraud purchasers of securities even if the purchasers

6   do not directly rely on the misstatements. *Binder v. Gillespie*, 184 F.3d 1059, 1064

7   (9th Cir. 1999). To benefit from the presumption, the subject securities must have

8   traded on an efficient market. *Basic*, 485 U.S. at 246; *Binder*, 184 F.3d at 1064-65.

9   The Ninth Circuit has used the "*Cammer*" factors to determine whether an

10  efficient market is established. *See Binder*, 184 F.3d at 1064 (citing *Cammer v.*

11  *Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). The *Cammer* factors are as

12  follows: (1) weekly volume of trades in the security; (2) the extent of analyst

13  coverage; (3) arbitragers and market-makers in the security; (4) whether the

14  company is eligible to file a registration statement on form S-3; and (5) facts

15  showing a cause-and-effect relationship between unexpected corporate events or

16  financial releases and an immediate response in the stock price. *Cammer*, 711 F.

17  Supp. at 1286-87.

18  Generally, determining whether a security was traded on an efficient

19  market is not appropriate on a motion to dismiss, as such issues are more properly

20  addressed at class certification through expert discovery. *See Batwin v. Occam*

21  *Networks, Inc.*, 2008 WL 2676364 (C.D. Cal. July 1, 2008) (declining to address

22  challenge to efficient market allegations; determining issues is appropriate at class

23  certification); *In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 305 n.174 (S.D.N.Y.

24  2005) (citations omitted); *see also Levine v. SkyMall, Inc.*, 2002 WL 31056919

25  (D. Ariz. May 24, 2002) (considering efficient market at class certification with

26  benefit of expert declarations).

27

28

"[T]he question on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one." *Hayes v. Gross*, 982 F.2d 104, 108 (3d Cir. 1992) (explaining allegations addressing *Cammer* factors adequately state market efficiency on Rule 12 motion); *In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp.2d 751, 763 (N.D. Ohio. 2003) (finding efficient market for Bulletin Board stock on motion to dismiss because *Cammer* factors alleged), *cf. Raymond v. Merrill Lynch, Pierce, Fenner & Smith*, 1991 WL 520500, at *4 (C.D. Cal. Aug. 5, 1991) (dismissing complaint because it did not allege a single *Cammer* factor); *In re Turbodyne Techs., Inc. Sec. Litig.*, 2000 WL 3396113, at *14 (C.D. Cal. Mar. 15, 2000) (pleading two *Cammer* factors insufficient to state a claim).

Here, Plaintiffs have more than adequately alleged market efficiency by pleading facts demonstrating that all five *Cammer* factors have been met. As to the <u>first factor</u>, the Complaint alleges that an average of 5.25 million shares of NutraCea Stock were traded on a weekly basis, and that 3.7% of all outstanding shares were traded on a weekly basis. ¶155b. This figure demonstrates a "strong presumption" the market is efficient. *Levine*, 2002 WL 31056919, at *4 (explaining 2% presents a "strong presumption" of efficiency and 1% justifies a "substantial presumption"). Even if the Court were to discount by one-half for double-counting,[17] that would yield a percentage of 1.85%, which would create nearly a "strong presumption."

As to the <u>second factor</u>, the complaint alleges that NutraCea was covered by several stock analysts and that at least two such analysts issued reports about NutraCea. ¶155e. Moreover, at least eight investment advisory companies actively

---

17  Defendants have provided no authority to suggest that discounting for *double-counting is required for NutraCea's* trading during the Class Period. Thus, the Court should accept as true the 3.7% amount alleged in the Complaint. *See Metzler*, 540 F.3d 1049, 1055, n. 1 (on motion to dismiss must accept all well plead allegations as true).

followed NutraCea's common stock and least four additional other institutional investors bought, sold, or held NutraCea common stock. ¶155e-f. These facts weigh in favor of market efficiency. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004) (crediting plaintiff's expert's assertion that "there is a general understanding that a high level of institutional interest in a security serves to increase the efficiency of the market"); *S.E.C. v. Gane*, 2005 WL 90154, at * 12 (S.D. Fla. Jan. 4, 2005) (institutional investors is a factor that is relevant in determining market efficiency); *cf. In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 662-63 (D. Utah 2008) (four analysts support a finding of an efficient market but two analysts issuing reports does not).

As to the third factor, there were at least 30 market makers in NutraCea's Stock at any given time during the Class Period. ¶155f. This fact weighs in favor of market efficiency. *See Levine*, 2002 WL 31056919, at * 6 (22 market makers support finding of market efficiency); *Cheney v. Cyberguard Corp., 213* F.R.D. 484, 500 (S.D. Fla. 2003) (finding that 15-19 market makers is "significant" and "appears to support a determination of [market] efficiency") (citation omitted); *Cammer*, 711 F.Supp. at 1283, n. 30 (11 market makers).[18]

As to the fourth factor, NutraCea was eligible to file Form S-3 Registration Statements and did so in connection with its April 2008 offering.¶155c. Indeed,

---

18   NutraCea cites *O'Neill v. Appel*, 165 F.R.D. 479, 501-02 (W.D. Mich. 1996) for the proposition that "twenty-eight market makers are insufficient" on a class certification motion. *O'Neill* is not binding on this Court and is inapposite. The court merely explained that "there mere number of market makers, without much more information" is not very helpful. *Id.*, at 502. Moreover, the decision to find there was a no efficient market turned on the fact that "the weekly trading volume of Embrace common stock was *miniscule to nonexistent* for most of the class period" (at 501); and the stock was not eligible to file an S-3 at anytime (at 502). Defendants' citation to *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) is likewise unhelpful, as it was decision on class certification and involved the Court's analysis of the market maker criteria in light of expert evidence submitted.  *Krogman*, 202 F.R.D. at 475-76.

NutraCea first filed a Form S-3 with the SEC on January 29, 2008 and again on March 28, 2008. *See* Kim Decl., Ex. 4. The eligibility to file a Form S-3 with the SEC is a factor that Courts have considered "extremely important" in determining whether a company's stock trades in an efficient market. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 216887, at *7 (S.D.N.Y. Aug. 1, 2006); *Levine*, 2002 WL 31056919, at *6; *Griffin v. GK Intelligent Sys. Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000). While Defendants argue the requirements for filing of a Form S-3 were amended prior to NutraCea's filing a Form S-3, Defendants fail to cite a single case where this change impacts the importance of the S-3 in evaluating this *Cammer* factor. *See Bombardier*, 2006 WL 216887, at *7, n.95 (explaining the S-3 factor remains extremely important even though at the time of *Cammer*, it required $150 million public float and 36 months of continuous SEC reports, compared to $75 million public float and 12 months of continuous reporting requirement in effect). The 2008 amendments allowed issuers with a public float less than $75 million to utilize the Form S-3, but kept the other prior requirements the same, i.e., the issuer filing SEC reports continuously for 12 months. Here, when NutraCea filed its Form S-3, its public float was on average well over $130 million, and it had continuously filed its Form S-3. *See* Kim Decl., Ex. 4

As to the <u>fifth factor</u>, the Plaintiffs allege that unexpected news about NutraCea was rapidly reflected in and incorporated into the Company's Stock price. ¶155g. This factor is the most important. *Levine*, 2002 WL 31056919, at * 8 (explaining that this factor "is most important factor" in determining market efficiency and "weighs heavily in favor of finding … [the] stock was traded on an efficient market…") (citation omitted). Here, when the truth of the misstatements was revealed on February 23, 2009, the Company's stock fell 29%. ¶125. At the pleading stage this certainly demonstrates a cause and effect relationship "between

unexpected corporate events or financial releases and an immediate response in the stock price."    NutraCea, without citing any legal authority, claims that there is no efficient market because the Company's stock "fluctuated vastly, but not in reaction to any news."  Nutra. Mem. at p. 13:1-3. NutraCea cites to the March 9, 2009 and March 10, 2009 stock price movement of 39% to the upside. Preliminarily, a similar argument was rejected by the Court in *Levine,* where it was argued that "SkyMall stock's wild gyrations during the two-and-a-half trading days of the putative Class Period when no new fundamental-relevant information entered the market are even-more compelling evidence of market inefficiency." 2002 WL 31056919, at * 8.

In any event, there was unexpected news about the Company issued on that date. On March 10, 2009, the Company filed a Form 8-K with the SEC announcing that Edson had resigned as of March 9, 2009 and that a new CEO had been appointed.  *See* Kim Decl., Ex. 5.[19] Notably, the market viewed Edson's departure from the Company as positive news causing the Company's stock price to rise.

NutraCea also cites to the downward trend preceding the February 23, 2009 announcement, however, during that same period of time, the Russell 2000 index of small cap companies was also falling in a similar trend line.[20]  *See* Kim Decl., Ex. 6.[21] This argument further exemplifies that Defendants' lay argument, which is

---

19   The Court can take judicial notice of the Company's March 10, 2009 SEC 8-K filing. *Metzler*, 540 F.3d at 1064 n.7; Fed. R. Evid. 201(b).

20   With respect to the fifth *Cammer* factor an expert will consider the stock price movement compared to, among other things, market and peer group stock indices. *See e.g. Schleicher v. Wendt*, 2009 WL 761157, at * 5 (S.D. Ind. Mar. 20, 2009); *Wagner v. Barrick Gold*, 251 F.R.D. 112, 120 (S.D.N.Y. 2008).

21   The Court can take judicial notice of stock market index prices.  *See e.g. Terra Ins. Co. v. New York Life Inv. Management, LLC*, 2009 WL 2365883, at * 3 (N.D. Cal. Jul. 30, 2009) (over objection, taking judicial notice of "stock market indices" as the information is of public knowledge); *In re Keithly Instruments, Inc. Sec. Litig.*, 268

factually incorrect and unsupported by any empirical or other reliable evidence, is inappropriate at the motion to dismiss.[22]

Defendants' argument that because NutraCea's Stock traded over-the-counter and on the NASDAQ Bulletin Board, NutraCea Stock did not trade efficiently. The Ninth Circuit has rejected the exact same argument. In *Binder*, the Ninth Circuit explained that what is relevant is not what exchange a particular stock is traded on, but rather, whether the *Cammer* factors have been met. *Binder*, 184 F.3d at 1064-65 (collecting cases). Indeed, numerous courts have found an efficient market with securities traded on the Bulletin Board or the "Pink Sheets." *See e.g. HiEnergy Techs., Inc. Sec. Litig.*, 2006 WL 2780058, at *1, 5 (C.D. Cal. Sept. 26, 2006) (finding efficient market based on expert declaration, and certifying class of Bulletin Board stock); *Empyrean*, 255 F. Supp.2d at 751 (bulletin board stock on motion to dismiss); *Hoexter v. Simmons*, 140 F.R.D. 416, 419 (D. Ariz. 1991) ("The court agrees with plaintiffs that the mere fact that the Valley National shares were traded on the OTC market rather than on a national exchange does not prevent certification of the Class"). As explained above, the Complaint adequately alleges each *Cammer* factor.

## III.   THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 20(A) OF THE EXCHANGE ACT

---

F.Supp.2d 887, 994 (N.D. Ohio 2002) (taking judicial notice of stock prices and market indices; "In securities-fraud actions, courts will also examine the other information that was publicly available to reasonable investors ....").

22  *See e.g.*, *Levine,* 2002 WL 31056919, at * 7 - * 9 (addressing fraud-on-the-market and efficient market at class certification and considering expert declarations on market efficiency); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D. Cal. 2009) (same); *Connecticut Retirement Plans and Trust Funds v. Amgen*, 2009 WL 2633743, at * 12 (C.D. Cal. Aug. 12, 2009) (same);  *HiEnergy*, 2006 WL 2780058, at * 5 (considering efficient market of bulletin board stock at class certification and considering expert declaration).

As Plaintiffs have alleged Section 10(b) claims as explained above, and as Defendants do not deny that Crow or Edson exercised actual power or control over the Defendants, the Section 20(a) claims should not be dismissed.

## IV.   THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER A.R.S. § 44-1991(A)(3) AND § 44-2003(A)

### A.  Claims under 44-1991(A)(3) Are Governed by Strict Liability

Both the Ninth Circuit and the Arizona Court of Appeals have acknowledged the strict liability features of Arizona's securities statutes. *See Aaron v. Fromkin*, 196 Ariz. 224, 227 (App. 2000) ("Plaintiffs' burden of proof requires only that they demonstrate that the statements were material and misleading"); *Rosier v. First Fin. Capital Corp.*, 181 Ariz. 218, 222 (App. 1994) ("A misrepresentation in the sale of securities, even an innocent one, can be a violation of the securities statute . . . ."); *Garvin v. Greenbank*, 856 F.2d 1392, 1398 (9th Cir. 1988) (holding under § 44-1991 (now 44-1991(A)) that "[a] seller of securities is strictly liable for the misrepresentations or omissions he makes"). These decisions refer to misstatements under Subsection (2) of the statute, but the courts' reasoning applies to claims under Subsection (3) for a fraudulent course of business as well. That is because a fraudulent course of business under § 44-1991(A)(3) may be perpetrated through misrepresentations and omissions. *See State v. Superior Court*, 123 Ariz. 324, 331 (1979), *overruled in part on other grounds by State v. Gunnison*, 127 Ariz. 110, 113 (1980) (holding in a case involving § 44-1991 (A)(2) and (A)(3) claims that "specific omissions and misrepresentations, which allegedly operated as a fraud," stated a claim).

Moreover, nothing in the language of § 44-1991(A)(3) requires negligence. The language of § 44-1991(A)(3) focuses on the effect of the defendant's conduct on the investor. Reading negligence into the statute is imposing a requirement that

the legislature did not impose. *See Aaron v. Fromkin*, 196 Ariz. at 227 ("The elements of securities fraud are articulated within the statute itself").[23]

Arizona's courts have found primary interpretative guidance in the statement of intent that accompanied passage of Arizona's Securities Act. That legislative statement directs Arizona courts to avoid "narrow or restricted interpretation[s]" in favor of a liberal construction that protects the public.[24] Narrowing the public protection that § 44-1991(A)(3) provides with a negligence standard that the statute's words do not require is the type of restrictive interpretation that the legislature wished to avoid.

Defendants' reliance on § 44-2082(B) for the proposition that the complaint must plead Defendants' negligence is entirely misplaced because the statute does not oblige Plaintiffs to plead a "required"--but unspecified--state of mind. Rather, § 44-2082(B) requires that **if** an action under §§ 44-1991 or 44-1992 must plead that a defendant "acted with a particular state of mind . . . the complaint shall state with particularity facts . . . that the defendant acted with the required state of

---

23   The federal cases that Defendants cite for a negligence standard under Section 17(a)(3) of the 1933 Act are not controlling. In *Aaron v. SEC*, the U.S. Supreme Court held that scienter is not required for claims under Section 17(a)(3). 446 U.S. 680 (1980). *Aaron v. SEC* did not discuss whether negligence was required and did not make the holding on negligence that Defendants claim. Moreover, Arizona's courts have made it a point to hold that in interpreting Arizona's securities laws, they are not bound by U.S. Supreme Court interpretations of the federal securities laws. *Carrington v. Ariz. Corp. Comm'n*, 199 Ariz. 303, 305 (App. 2000).

24     When Arizona's Securities Act was enacted in 1951, the drafters included the following statement of legislative intent:

> Sec. 20. INTENT AND CONSTRUCTION. The intent and purpose of this Act is for the protection of the public, the preservation of fair and equitable business practices, the suppression of fraudulent or deceptive practices in the sale or purchase of securities, and the prosecution of persons engaged in fraudulent or deceptive practices in the sale or purchase of securities. This Act shall not be given a narrow or restricted interpretation or construction, but shall be liberally construed as a remedial measure in order not to defeat the purpose thereof.

Securities Act of Arizona, ch. 18, § 20, 1951 Ariz. Secs. Laws 46, 75.

mind." § 44-2082(B). I.e., a particular state of mind is an element of some actions under § 44-1991, but not an element of others. For those actions under § 44-1991 in which a particular state of mind is an element, the complaint must plead relevant facts **with particularity**. For example, while claims under § 44-1991(A)(3), such as those in the instant matter, do not require negligence or scienter, claims under § 44-1991(A)(1) do require scienter. *See Orthologic Corp. v. Columbia/HCA Healthcare Corp.*, 2002 WL 1331735, at *5 (D. Ariz. Jan. 07, 2002) ("Because the language of § 17(a) of the 1933 Act and § 1991 of the Arizona Securities Act are identical in all relevant respects and because the Arizona Supreme Court has acknowledged its concurrence with the United States Supreme Court's interpretation of § 17(a), this court finds that proof of scienter is required to succeed on a claim under § 1991(A)(1), but not under § 1991(A)(2) or § 1991(A)(3)").

Even if the Court finds that Plaintiffs must plead negligence, which is the only required state of mind that Defendants argue must be pleaded, Plaintiffs have at least made allegations that infer negligence.

### B. Defendants Violated Arizona Securities Law Even If They Did Not Dispose of Any Securities Or Make an Offer to Plaintiffs

Defendants are liable for violating §§ 44-1991(A) and 44-2003(A) even if they did not dispose of any securities or make an offer to Plaintiffs. § 44-1991(A) states in pertinent part:

> A. It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, . . . directly or indirectly to . . . :
> . . . .
> 3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

§ 44-1991(A). § 44-1991(A) does not state that only a party who offers to sell/buy or sells/buys securities violates the statute. Rather, it states that a party is liable if he "directly or indirectly . . . . engage[s] in any transaction, practice or course of business" "**in connection** with a transaction . . . involving an offer . . ." to sell/buy or a sale/purchase of securities. § 44-1991(A) (emphasis added).

The statute that defines who is liable for securities fraud is § 44-2003(A), not § 44-1991(A). *See Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 22 (App. 1996) (holding that § 44-2003(A) defines those persons who may be liable). § 44-2003(A) states:

> Subject to the provisions of this section, an action brought under § 44-2001, 44-2002 or 44-2032 may be brought against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the person who is entitled to maintain such action. No person shall be deemed to have participated in any sale or purchase solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale or purchase.

§ 44-2003(A). By its words, § 44-2003(A) imposes liability not only on persons who make a sale, but on those who induce or participate in the sale. Inducement and participation extend liability to persons other than the offeror or seller. For example, in *State v. Superior Court*, the defendants included the Arizona Corporation Commission and its officers. 123 Ariz. 324 (1979). Neither the ACC nor the officers offered or sold any securities, but the Arizona Supreme Court upheld an inducement claim against them. *Id.* at 332 ("The theory of Count I is clearly that the misrepresentations and omissions of the Corporation Commissioner officer defendants induced the plaintiffs to become depositors in the Associations. As such, a cause of action pursuant to § 44-1991 is properly stated against these defendants. A.R.S. § 44-2003"); *Trump v. Badet*, 84 Ariz. 319,

322-23 (1958) (upholding judgment against incorporators under participant liability who used an attorney to find investors for their company).

### C. Defendants Participated in the Sale of Securities and Induced Plaintiffs To Purchase Securities

Arizona's courts have insisted that Arizona's securities laws be read more broadly than federal law in order to protect investors. *See Siporin v. Carrington*, 200 Ariz. 97, 103 (App. 2001) (refusing to follow federal precedent on treatment of viatical settlements as investment contracts under statutory definition of securities because "we will not defer to federal case law when, by doing so, we would be taking a position inconsistent with the policies embraced by our own legislature"); *Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399, 411 (App. 2003) (declining to follow federal precedent on control liability because the "actual participation" requirement adopted in some Ninth Circuit decisions was "too restrictive to guard the public interest as directed by our state legislature").

To that end, participation and inducement should be interpreted broadly enough to reach issuers and insiders who mislead aftermarket purchasers. Defendants mistakenly rely on federal law in interpreting § 44-2003 so narrowly that there would be no ability to reach insiders and issuers responsible for the distribution of misleading market information and fabrication of sham transactions, as Defendants were. *See Standard Chartered PLC*, 190 Ariz. at 22 ("The parties devote a portion of their briefs to federal cases interpreting federal securities statutes. *See* Securities Exchange Act of 1934, §§ 10(b), 18, 28, 28(a), 15 U.S.C.A. §§ 78j(b), 78r, 78bb, 78bb(a); Securities Act of 1933, §§ 11, 12(2), 15 U.S.C.A. §§ 77K, 77 l(2). Because, however, there is no counterpart in those statutes to the participation-or-inducement standard of our state statute, the federal statutes do not guide us here").

51

PLS.' CONSOLIDATED MEMORANDUM OF P&As IN OPP. TO DEFS.' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   Indeed, § 44-1991 imposes an "affirmative duty not to mislead." *Aaron v.*
2   *Fromkin*, 196 Ariz. at 227; *State v. Superior Court*, 123 Ariz. at 331; *Trimble v.*
3   *Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 553 (App. 1986). Holding issuers and
4   insiders strictly liable for their proportionate fault in misleading aftermarket
5   investors advances the remedial goals of the Arizona statute. A narrower
6   interpretation would not adequately protect the public. *See Strom v. Black*, 22
7   Ariz. App. 102, 103-04 (App. 1974) (affirming judgment against business broker
8   and salesman who placed ads with misleading financial statements were found to
9   have participated in and induced securities violations).

10   The Complaint alleges Defendants induced investors to purchase NutraCea
11   stock, and therefore adequately pleads a cause of action under § 44-2003(A).[25]
12   *See State of Arizona v. Superior Court*, 123 Ariz. at 330-31 (denying motion to
13   dismiss on a §1901 claims against parties collateral to the securities transaction,
14   because plaintiffs cited "specific omissions and representations" made by the
15   collateral parties which induced plaintiffs to engage in the transaction).   The
16   Complaint alleges that Defendants' caused investors to purchase NutraCea stock at
17   artificially inflated prices by misrepresenting the financial performance of
18   NutraCea during the Class Period. ¶¶ 152, 164, 169, 170, 171.

19   Defendants' reliance on *Grand v. Nacchio,* 2009 WL 3103761 (Ariz. App.
20   Div. 2, Sept. 29, 2009) is misplaced. *Grand* was decided on the question of
21   whether an issuer "participated in" an aftermarket purchase by the appellant and
22   did not address the question of what constitutes inducement.[26]

23

24   _____
25   25   The word induce means: "To lead or move, as to a course of action, by influence or
     persuasion. See Synonyms at persuade."  The American Heritage® Dictionary of the
26   English Language, Fourth Edition Copyright © 2009 by Houghton Mifflin Company.
     26   Plaintiffs' liaison counsel in this action is also additional counsel in *Grand.*  Liaison
27   counsel has informed the undersigned appellants in *Grand* intend on filing a petition for
     review with the Arizona Supreme Court.
28

### D.  Defendants Are Liable Regardless of Privity or a Lack Thereof

Defendants misread *Trump*. *Trump* states as a general rule that an investor has no claim against a party who received no consideration. 84 Ariz. At 322. But, that statement is immediately followed by a discussion of § 44-2003(A), which *Trump* interpreted as extending liability to those who receive no consideration but nonetheless induce the sale. *Id.* at 323. The same analysis of extended liability to nonsellers was followed in *State v. Superior Court*, 123 Ariz. at 331 (citing *Trump* for the general rule, but explaining that § 44-2003 allows a claim against any person who participates in or induces the sale).

Moreover, the idea of privity is inconsistent with participation and inducement under § 44-2003(A), which connotes a broader range of liability. Narrowing participation and inducement with a privity requirement would contravene the plain language of § 44-2003(A).

### E.  The Complaint Adequately Alleges Claims under A.R.S. § 44-1999(B)

As Plaintiffs alleged claims under § 44-1991(A)(3) as explained above, and as Defendants do not deny that Crow or Edson exercised actual power or control over Defendants, the claims under § 44-1999(B) should not be dismissed.

### CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and grant any further or other relief the Court deems just and proper.

Dated: October 21, 2009                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM P.A**.


                                           /s/ Phillip Kim
                                           Phillip Kim (*pro hac vice*)
                                           Laurence Rosen (*pro hac vice*)
                                           Timothy Brown (*pro hac vice*)
                                           350 Fifth Avenue, Suite 5508
                                           New York, NY 10118
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827

                                           Lead Counsel for Plaintiffs

                                           **TIFFANY & BOSCO, P.A.**
                                           Richard G. Himelrick (#004738)
                                           J. James Christian (#023614)
                                           Third Floor Camelback Esplanade II
                                           2525 East Camelback Road
                                           Phoenix, Arizona 85016-4237
                                           Telephone: (602) 255-6000
                                           Fax: (602) 255-0103

                                           Liaison Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Phillip Kim, hereby declare under penalty of perjury as follows:
I am attorney with the Rosen Law Firm, P.A., with offices at 350 5th Avenue, Suite 5508, NY, NY 10118.  I am over the age of eighteen.

On October 21, 2009, I electronically filed the following PLAINTIFFS'CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on October 21, 2009

_____/s/ Phillip Kim_____