**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick (#004738)
J. James Christian (#023614)
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Fax: (602) 255-0103
rgh@tblaw.com
jjc@tblaw.com

Liaison Counsel for Plaintiffs

**THE ROSEN LAW FIRM P.A**.
Phillip Kim (*pro hac vice*)
Laurence Rosen (*pro hac vice*)
Timothy Brown (*pro hac vice*)
350 Fifth Avenue, Suite 5508
New York, NY 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
tbrown@rosenlegal.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| JENNIFER BURRITT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> vs. <br><br> NUTRACEA, BRADLEY D. EDSON, TODD C. CROW, AND DAVID BENSOL, <br><br> Defendants. | No.  CV-09-00406-PHX-FJM <br> (**Consolidated**) <br> <u>CLASS ACTION</u> <br><br> PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BRADLEY EDSON'S MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

STATEMENT OF FACTS…………………...…………………....….…...…1

ARGUMENT…………………….…….…...………………….…...….…...1

  I.  PLAINTIFFS ADEQUATELY ALLEGE EDSON'S SCIENTER………........1

      A.  Scienter Pleading Standards………....……………………….…....1

      B.  NutraCea's Admissions in Its October 20, 2007 10-K Prove Scienter...…..2

      C.  The *Magnitude* of the Accounting Fraud Supports a Strong Inference
          Of Scienter……………………….………...……………….....3

      D.  Defendants' Departure From Their Own Publicly Announced
          Accounting Policies Support a Strong Inference of Scienter………...…..5

      E.  The Circumstances Surrounding the Restated Transactions Demonstrate
          that Edson and Crow Knew of the Fraud…………………….................6

      F.  The Confidential Witnesses Allegations Are Properly Before
          the Court.……………...…………….…...……….........….………......12

          i.  CW1 and CW2………..…...…………...…………......……...13

          ii.  CW3…………..…...………….…...……………...…….……13

      G.  Additional Scienter Allegations…………….…………......…..………14

  II.  PLAINITFFS ADEQUATELY ALLEGE EDSON'S CONTROL PERSON
      LIABILITY UNDER SECTION 20(A) OF THE EXCHANGE ACT……...…..16

  III.  THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER A.R.S. §
      44-1991(A)(3) AND § 44-2003(A) …………………...……...….……17

CONCLUSION……………………...…..………………………...….……17

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)……………………………..………….5

*Bernstein v. Crazy Eddie, Inc.*,
    702 F.Supp. 962 (E.D.N.Y. 1988) ……………………….…….……...7 n.4

*Carlson v. Xerox.*,
    392 F.Supp.2d 267 (D. Conn. 2005)……………….………...……………..8

*Howard v. Everex Sys.*,
    228 F.3d 1057 (9th Cir. 2000)…………………...………....……..15 n.10

*In re Baan Co. Sec. Litig.*,
    103 F. Supp. 2d 1 (D.D.C. 2000)……………..………………………….4

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996)………………………...……………6

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir.2005)……...…………...……………………...…4, 15

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005)…………………....…..…...….4

*In re Hypercom Corp. Sec. Litig.*,
    2006 WL 726791 (D. Ariz. Mar. 9, 2006)………..……………………….5

*In re IMAX Secs. Litig.*,
    587 F.Supp.2d 471, 483 (S.D.N.Y. 2008) ..…………….……………….......6

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)……………………………………..5

*In re Nuvelo, Inc., Sec. Litig.*,
    2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ………………….……………16

*In re Rent-Way Sec. Litig.*,
     209 F. Supp. 2d 493 (W.D. Pa. 2002)……………………...…………....…… 5 n.2

*In re Seitel, Inc. Sec. Litig.*,
     447 F. Supp. 2d 693 (S.D. Tex. 2006)...……….……………….……….…… 5 n.2

*In re Time Warner, Inc. Sec. Litig.*,
     9 F.3d 259 (2d Cir. 1993)...…………….......……………………...…15 n.10

*In re Veeco Instruments, Inc. Sec. Litig.*,
     235 F.R.D. 231 (S.D.N.Y. 2006)…………….…………………….…....…4

*In re Winstar Commc'ns*,
     2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)…………..….……………….6 n.3

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
     513 F.3d 702 (7th Cir. 2008) ……………………….……….……….7 n.4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
     540 F.3d 1049 (9th Cir. 2008)………………..…...……….……...……2, 2 n.1

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
     320 F.3d 920 (9th Cir. 2003)……………….…………………….…....…15

*Patel v. Parnes*,
     253 F.R.D. 531 (C.D. Cal. 2008)………….…………………………….…1

*Provenz v. Miller*,
     102 F. 3d 1478 (9th Cir. 1996)…...…………………………..…………5

*Roth v. Aon Corp.*,
     2008 LEXIS 18471 (N.D. Ill. Mar. 7, 2008)…….…....…………………5 n.2

*Rothman v. Gregor*,
     220 F.3d 81 (2d Cir. 2000)...…………………...…………………… 5 n.2

*SEC v. Grossman*,
     1987 U.S. Dist. LEXIS 1666 (S.D.N.Y. Feb. 17, 1987) …………………..…….8

iii

*Sirota v. Solitron Devices, Inc.,*
    673 F.2d 566 (2d Cir.) 459 U.S. 838 (1982) ………...………………..……7 n.4

*South Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008)..………....…..................................1, 2, 3, 11

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.,*
    2009 WL 890479 (D. Ariz. Mar. 31, 2009)…...…………………..……………2

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.,*
    27 S. Ct. 2499 (2007)………………………..….......................1, 2, 7 n.4, 15

*U.S. v. York,*
    933 F.2d 1343 (7th Cir. 1991) …………………..…………………………......6

*Weiss v. Amkor Tech., Inc.,*
    527 F.Supp.2d 938 (D. Ariz. 2007) ……...……......……......……..……14 n.9

*Wilson v. Williams,*
    182 F.2d 562 (7th Cir. 1999) …………….…...........……………….…………6

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009)…………………...……………...……2, 12, 13 14

**STATUTES**

15 U.S.C. § 78u-4(b)(2)…………………………………………....…………...……1
A.R.S. § 44-1991(A)(3) …………………………………...…………..……...……17
A.R.S. § 44-2003(A)…………………..…………………………….…...…….....17

iv

1    Lead Plaintiff Harvey Pensack, and named plaintiffs Jennifer Burritt and Jose

2    Medrano (collectively "Plaintiffs"), individually and on behalf of all other persons

3    similarly situated submit this memorandum in opposition defendant Bradley Edson's

4    ("Edson") motion to dismiss the First Amended Consolidated Class Action Complaint

5    (the "Complaint").    Plaintiffs join, adopt and incorporate the arguments, made in

6    Plaintiffs' separate memoranda in opposition to the motions to dismiss filed by

7    defendants NutraCea or the "Company" and Todd C. Crow ("Crow").

## STATEMENT OF FACTS

9    Plaintiffs incorporate by reference the statement of facts set forth in Plaintiffs'

10    opposition to NutraCea's motion to dismiss, including those concerning loss causation

11    and reliance, as if fully set forth herein.

## ARGUMENT
## I.    PLAINTIFFS ADEQUATELY ALLEGE EDSON'S SCIENTER

### A. Scienter Pleading Standards

15    The PSLRA requires plaintiffs asserting federal securities fraud claims to "state

16    with particularity facts giving rise to a strong inference that the defendant acted with the

17    required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite recklessness must be an

18    extreme departure from the standards of ordinary care, and . . . present [ ] a danger of

19    misleading buyers that is either known to the defendant or so obvious that the actor must

20    have been aware of it." *Patel v. Parnes*, 253 F.R.D. 531, 555 (C.D. Cal. 2008). Reckless

21    conduct can meet the PSRLA, but only "to the extent that it reflects some degree of

22    intentional or conscious misconduct, or what [the Ninth Circuit] has called deliberate

23    recklessness." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

24    For an inference of scienter to be strong, "a reasonable person would deem [it] . .

25    . cogent and at least as compelling as any opposing inference one could draw from the

26    facts alleged." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 324 (2007).

27    "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter,

28    the court must take into account plausible opposing inferences." *Id*. "A court must

compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). If the inference of scienter is equally as compelling as any innocent inference, then the motion to dismiss must be denied. *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F.Supp.2d 763, 791-92 (D. Ariz. 2009) (explaining that under *Tellabs* "that a tie goes to the Plaintiff in terms of competing inferences of scienter").

After *Tellabs*, the Ninth Circuit permits a district court to evaluate all together a series of less precise allegations to meet the PSLRA requirement. *South Ferry*, 542 F.3d at 784; *see Tellabs*, 511 U.S. at 326. Thus, after *Tellabs*, "vague, ambiguous, or general allegations," which may have been dismissed under prior Ninth Circuit case law, "are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *South Ferry*, 542 F.3d at 784.

### B. NutraCea's Admissions in Its October 20, 2007 10-K Prove Scienter

NutraCea's 10-K makes clear that the restatement was the result of fraud by NutraCea's senior management.[1]  The 10-K states in relevant part:

> The Audit Committee concluded that the errors and irregularities were primarily the result of an ineffective control environment which, among other things, permitted the following to occur:
> • recording of improper accounting entries; and
> • withholding information from, and providing of improper explanations and supporting documentation to, the Company's Audit Committee and Board of Directors, as well as its independent registered public accountants.

Kim Decl., Ex. 1 at p. 72. The 10-K soft-pedals the fraudulent conduct by using euphemisms such as "providing of improper explanations and supporting documentation" instead of the more accurate terms for what occurred: "lying and

---

1  The court can take judicial notice of the Company's 2007 10-K. *Metzler*, 540 F.3d at 1064 n.7.

providing false information."  Notably, only the highest level of NutraCea management, such as the CEO and CFO would have interacted with the audit committee, and board of directors on these accounting judgments.

The Company's annual report for the fiscal year ended December 31, 2007 filed on March 17, 2008 states that "Under the supervision and with participation of our management, including our Chief Executive Officer and Chief Financial Officer" an evaluation of NutraCea's internal controls was made. *See* Kim Decl., Ex. 2 at p. 36. There Edson and Crow identified a material weaknesses concerning revenue recognition.  The 2007 10-K states in relevant part:

> We do not have adequate procedures to assure that <u>significant</u> and complex <u>transactions are timely analyzed and reviewed. As a result, significant adjustments to the results of operations have been required at year-end and at the end of last three quarters of 2007 prior to filing our 10-K and 10-Qs for 2007, including adjustments relating to revenue recognition, valuation of certain receivables</u> …

Kim Decl., Ex. 2 at p. 37. Edson and Crow promised to implement a remediation plan that would ensure the Company's revenue recognition practices are consistent with GAAP for transactions in excess of $100,000 per customer per quarter, or over $250,000 in any one year and to verify that collectability is reasonably assured. Edson and Crow also assured investors that the Board will expand its documentation requirements and receive analyses from the CFO and COO when reviewing significant transactions; to improve the Company's month-end and quarter-end closing documentation; and take other remedial steps to improve accounting and disclosure controls. *See* Kim Decl., Ex. 2 at p. 37-38.  Edson's and Crow's fingerprints are all over these GAAP violations. *See South Ferry*, 542 F.3d at 781 ("it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers. . .").

## C.    The *Magnitude* of the Accounting Fraud Supports a Strong Inference of Scienter

"While scienter cannot be established by publishing inaccurate accounting figures, even when in violation of GAAP, significant violations of GAAP standards

provide evidence of scienter so long as they are plead with particularity." *In re Daou Sys.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (citations omitted). Indeed, "when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves." *Id.*, (quotation and citation omitted). Where a complaint describes with particularity: GAAP violations, the accounts that were restated, the time period, the amount of the adjustment, and if the adjustments involve relatively straightforward accounting principles and are of great magnitude, such adjustments may be evidence of a strong inference of scienter. *Id.*, at 1017-19.

Premature revenue recognition is the type of GAAP violation that gives rise to a strong inference of scienter because it is simple--money should not be counted as "in the bank" when it has not yet been received. *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *20-21 (E.D.N.Y. Sept. 19, 2005) (premature revenue recognition suggests a strong inference of scienter) (quoting *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000)); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 231-32 (S.D.N.Y. 2006). As explained below, the substance of these transactions along with the nature of these GAAP violations coupled with their magnitude – and the fact the violations all resulted in the Company reporting increased revenue and in some cases a profit rather than a loss, point the compass toward a finding of intentional wrongdoing.

The Complaint identifies the specific GAAP provisions and the Company's stated accounting policies that were violated. These provisions are basic and straightforward provisions stating that revenue should be recorded when earned, when goods are shipped and risk of loss has passed to the buyer, or where collectability is reasonably assured. ¶¶63-81.The Complaint also identifies each of the statements that are false, the restatement adjustment, and the magnitude of the correction as compared to previously reported figures. These figures are as high as 425% and allowed Defendants to report profits, when in fact the Company had suffered steep losses. *E.g.* ¶5. The overstatement

figures for Q2 2007 and FY 2007 are even higher when one includes the additional restated transaction from the October 20, 2009 10-K. For example, revenue is now overstated in Q2 2007 and FY 2007 by 292% and 63%, respectively. *See* Kim Decl., Ex, 1 at p. F-67 *cf.*, ¶5b.

The magnitude of these restatements and their impact on NutraCea's restated financials demonstrate a strong inference of scienter. *See, e.g.*, *In re McKesson HBOC, Inc., Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000) (strong inference of scienter because"[t]he corrected accounting reveals that revenue inflation exceeded 25% in some quarters"). Other courts follow this general rule. *See e.g. Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) ("the sizable impact on [the company]'s reported earnings of these alleged violations of GAAP also support an inference of scienter"); *In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791, at *4 (D. Ariz. Mar. 9, 2006) ("the greater the magnitude of the restatement or GAAP violation, the more likely that such a restatement or violation was made consciously or recklessly").[2]

### D.   Defendants' Departure From Their Own Publicly Announced Accounting Policies Support a Strong Inference of Scienter

Scienter may also be inferred from Defendants' departure from the Company's own publicly announced revenue recognition policy. ¶¶63-81. Deviating from a company's internal accounting policies in a way that violates GAAP is sufficient to create a strong inference of scienter. *See Provenz v. Miller*, 102 F. 3d 1478, 1490 (9th

---

[2]  *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-downs "renders less credible" defendants' argument that they acted without scienter); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506-07 (W.D. Pa. 2002) (income restated downward by 152%)*; Roth v. Aon Corp.*, 2008 WL 656069, at *7 (N.D. Ill. Mar. 7, 2008) (scienter established, in part, by 20% overstatement of income); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) ("The court finds that the magnitude of the restatement, in this case, significantly contributes to a finding of scienter").

Cir. 1996) (denying summary judgment because failure to follow internal accounting policies indicates that GAAP violations are deliberate); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1458-59, n. 10 (N.D. Cal. 1996); *In re IMAX Sec. Litig.*, 587 F.Supp.2d 471, 483 (S.D.N.Y. 2008) ("the failure of . . . defendants to conform the financial results to [the company's] own publicly disclosed accounting policy" formed a basis to conclude that scienter had been adequately alleged).[3]

### E.    The Circumstances Surrounding the Restated Transactions Demonstrate that Edson and Crow Knew of the Fraud

Each of the five restated transactions carries the hallmark of fraud.  Each was for a substantial amount - over $1.0 million. Each involved implementing the most basic accounting principles. And each resulted in overstating and/or prematurely recognizing revenue. It is not merely chance, it is Defendants' intent, that none of the improper transactions resulted in reducing reported revenue. *See U.S. v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991), *cert. denied*, 502 U.S. 916, *overruled on other grounds by Wilson v. Williams*, 182 F.2d 562 (7th Cir. 1999) ("Dean Wigmore's 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves; the recurrence of a similar result … tends to establish … the presence of the normal, i.e. criminal, intent accompanying such an act.").

Not only do the undisputed circumstances, demonstrate intentional wrongdoing, witnesses with personal knowledge affirm that Defendants had actual knowledge of two of the improper transactions, and in at least one case, persuaded a customer to provide false documentation to support the improper accounting treatment.

**Famous Discoveries $1.6 million transaction**: This transaction involved the Company's improper recognition of $1.6 million in revenue in December 2006—at the very end of Q4 and FY 2006—which represented overstatements as high as 49% for

---

3   *See also In re Winstar Commc'ns*, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006) ("Other evidence that may be considered in establishing scienter is [. . .] violations of the company's own internal policies for reporting revenue and earnings").

revenue and 425% for net income for those periods. *E.g.,* ¶¶18-19, 5a.  This impropriety allowed the Company to post "record" results, and allowed Edson to tout the Company's "first full year of profitability,"  when in reality the Company should have reported net losses. ¶¶83-84. This purported sale on credit of $1.6 million of Dr. Vetz PetFlex product to Famous Discoveries was in fact a sham consignment arrangement and should not have been recognized as revenue at all, as such recognition violated GAAP and the Company's own internal accounting policies. [4] *E.g.,* ¶¶18-19, 72-74.  Edson knew that the transaction was a consignment arrangement, as he negotiated the terms of the transaction with the Famous Discoveries' senior executives. ¶¶76, 78, 139.  Edson knew, that the actual product was never delivered to Famous Discoveries' warehouses, and that Famous Discoveries had "no risk" and no obligation to purchase this product from NutraCea unless and until Famous Discoveries obtained a firm purchase order from or had been paid by its customers. ¶¶75-79. During the negotiations, Edson was told that Famous Discoveries was unwilling to take on a large amount of debt or inventory, as it was contrary to its business practice and intent.  Edson knew it was a consignment sale, and that it was not recognizable revenue.  This alone establishes Edson's scienter.

NutraCea provided a false explanation for the GAAP violation further evidencing scienter. NutraCea claimed it resulted from the Company's inexperience in the infomercial market, and Famous Discoveries' subsequent inability to pay. (¶17). This

---

4   Courts have long found consignment transactions as this one to be fraudulent. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572-76 (2d Cir.) (defendants liable for securities fraud because they reported consignment transactions as sales), *cert. denied*, 459 U.S. 838 (1982); *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 970-71 (E.D.N.Y. 1988) (it is a "fraudulent practice [ ]" to treat as sales "[t]ransactions that were really consignments."); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("Channel stuffing becomes … fraud only when it is used … to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled-ownership and its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid.").

excuse is false because Edson was aware of the consignment arrangement, he knew that Famous Discoveries was unwilling to take on a large amount of debt or inventory, and because NutraCea actually had extensive experience in infomercial sales. ¶87. *See Carlson v. Xerox,* 392 F.Supp.2d 267, 285 (D. Conn. 2005) ("Exculpatory statements, when should to be false, are circumstantial evidence of guilty consciousness and have independent probative force.") (quoting *SEC v. Grossman*, 1987 U.S. Dist. LEXIS 1666, at  34 (S.D.N.Y. Feb. 17, 1987)).

Defendants erroneously argue that the $1.6 million transaction is merely an issue of timing, weakening scienter. Defendants admit the transaction should have been reversed in 2006, earlier than it was. Defendants do not contend that the transaction has or will ever result in <u>any</u> recorded revenue; It won't. ¶18.

**$2.6 million related loan transaction**: The $2.6 million in revenue recorded in Q2 2007 in connection with the purported sale of Dr. Vetz PetFlex product was a sham. The purchaser's down payment was provided through a secret $1 million loan made to the purchaser by a person who at the time was a consultant to, and former officer of, NutraCea—Ike Lynch ¶¶9, 149. The loan, and its related party nature, were concealed from the Company's auditors and never disclosed publicly by the Company. ¶9. In the February 23, 2009 announcement, the Company admitted that the entire $2.6 million should not have been recognized as revenue and that the evidence relied upon by the Company to determine the purchaser's ability to pay the $1.6 million balance was false. ¶¶9, 97-98.   The fraudulent nature of the transaction is evidenced by the manner in which the Company corrected it. In reversing the $2.6 million of revenue from the transaction the Company simultaneously credited and debited the line item of cost of goods sold by $557,000. Effectively, the inventory associated with this purported sale was accounted for as being worthless and wiped clean from NutraCea's books along with the $2.6 million in revenue. ¶98.

Edson knew the true details of the $2.6 million transaction as he admitted that he monitors the Company's major revenue transactions to ensure proper accounting treatment. In the Q1 2007 press release, Edson stated that the Company did not meet its projected revenue for Q1 2007 because of issues relating timing and that $2.6 million in sales would be recognized in Q2 2007. ¶¶92-93. During the Q1 2007 conference call, Edson also explicitly acknowledged to investors that he knew the importance of revenue recognition and that he intensively worked with the Company's auditors. Edson said in relevant part:

> Well, I think it's an unfortunate issue, and, ah, really caught us off-guard. I, I will tell you that I take these things very seriously. I had intense discussions with our auditors, and I'm gonna do everything that I can with our accounting staff to make sure that our paperwork on orders, ah will comply with all of the rules and regulations so that we don't have a recognition issue, uh, because we obviously wanna book all the revenue we can in the quarter that we expended the aeh, the time and the effort and the money, so we're gonna do everything we can. I understand the importance of it, uhm, you know, people make mistakes, but I will tell you I usually don't make a mistake twice.  ¶95.

During the same call, Edson also falsely reassured investors that there would be no issues with respect to purchase orders in the future and revenue recognition in the future.

> ….What I will assure you is that in conjunction with our accountants, we now are very clear on what our purchase orders will state, so that there won't be any in the future, any of these revenue recognition items because of some of these intricacies of the accounting rules.

¶96.

Edson's contention that there was nothing "malicious" with his comments and that he was merely reaffirming his "determination to properly account for this transaction and its other business" misses the point.  Edson Mem. at p. 6:24-26. Edson's false reassurances prove his knowledge of the facts underlying the false revenue recognition. Edson admitted he was actively involved in the accounting judgments as to how revenue from these improper transactions was recognized.

The Company admitted the restatement was caused by senior management withholding and providing false information to the Board, Audit Committee and the Company's auditors. (Kim Decl., Ex. 1 at p. 72). NutraCea separately admitted that this transaction was restated because of false evidence of collectability. (¶97). Reading these two admissions together, the most logical inference is that Edson and/or Crow provided the false information about the transaction to the Company's Board, Audit Committee and auditors.

**$5 million round trip transaction**: The $5.0 million license fee that was recorded as revenue in Q2 2007 is strongly indicative of scienter because it was a sham "round-trip" transaction that never should have been recorded. When PAHL paid the $5 million to NutraCea for a license to market and distribute certain products, a NutraCea subsidiary, Medan LLC, simultaneously purchased $10.675 million of capital stock of an Indonesian company from FFOL (the same principal shareholder controls both PAHL & FFOL) in two transactions ($8.175 and $2.5 million). NutraCea then recorded the value of the stock on its balance sheet at $10.675 million. As part of the restatement, NutraCea was forced to write-down the value of the second stock purchase from $8.175 million to $3.175 million and reverse the $5.0 million license fee revenue. ¶¶ 81, 20-21. In effect, the license fee revenue transaction was a cashless round-trip transaction. NutraCea even admitted the same in the April 23 announcement: "the Company now believes the First Purchase of the PIN shares [from FFOL] and the payment of the License Fee should be viewed as a combined event with related parties." ¶¶127, 141.

It is not plausible that Edson and Crow did not know the true details of these transactions or the proper accounting treatment. Firstly, the related-party nature, the substantial amount of one-time license fee revenue, and that it involved a large capital investment in another company, akin to a major business acquisition, necessarily required CEO Edson and CFO Crow's participation and approval. This transaction, along with the $2.6 million related loan transaction, allowed NutraCea to overstate Q2

2007 revenue by 141% or $7.6 million and turned Q2 2007 net loss of $4.7 million to a profit of $2 million. ¶¶3, 104.

**ITV $2 million "bill and hold" transaction**: The $2 million in revenue the Company recorded in Q4 and FY 2007 in connection with its sale of $2 million RiceNShine product to ITV resulted in a Q4 2007 overstatement of revenue by 52%. The Company's February 23, 2009 announcement disclosed the revenue should not have been recorded in December 2007 because the transaction violated GAAP requirements for recognizing revenue on a "bill and hold" basis. ¶¶10-11, 60, 112.

Here, too, Defendants whimsically argue that because the $2 million "bill and hold" transaction was merely an issue of *when* the revenue would be recognized, scienter is undermined. Firstly, Defendants had a motivation to commit fraud and prematurely recognize revenue in order to meet analyst expectations, complete a $20 million stock offering and obtain a cash bonus for Edson. Secondly, Scienter is not negated because the revenue would be recognized in later quarters. Many fraudulent schemes rely on continued violations to maintain an appearance of prosperity and postpone the inevitable discovery and downfall.

Edson and Crow must have been aware of the details of the $2 million transaction considering that ITV accounted for a nearly half of the Company's sales revenue, at its peak, during the Class Period ¶3. *See South Ferry*, 542 F.3d at 781. Moreover, this sale took place in December 2007 on the eve of the end of NutraCea's quarter and fiscal year ended December 31, 2007, another hallmark of accounting fraud. ¶112. Defendants' knowledge of improper nature of transaction is further bolstered by the fact that the Company closely monitored all sales to ITV because it was obligated to pay commissions on those sales to NutraCea founder and former CEO Patricia McPeak. ¶137.

Moreover, CW3 allegations demonstrate a strong inference of scienter because Mr. Maihos personally admitted to CW3 in June 2008[5] that NutraCea fraudulently requested Mr. Maihos sign and backdate a letter to justify the "bill and hold" arrangement. ¶68d. This request was made not once, but twice. ¶68e. Following the second request in February 2008, Mr. Maihos executed the fraudulent bill and letter and backdated it (as NutraCea requested) in order to justify recognition of revenue on the "bill and hold" transaction. ¶68e. That Edson and Crow were aware of the fraudulent "bill and hold" letter is supported by the Company's admission in the October 2009 10-K that "senior management" provided improper explanations and supporting documentation to the auditors. *See* Kim Decl., Ex. 1 at p. 72.

### F.    The Confidential Witnesses Allegations Are Properly Before the Court

"[C]onfidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 981.

> First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.   Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.

*Id.* (quotations and citations omitted) (emphasis added). The first prong can be satisfied in the following ways. "Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Id.* When such additional evidence is absent, "confidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a

---

5   The telephone call took place in June 2008. ¶68c. Elsewhere in the Complaint, the Complaint mistakenly refers to the call taking place in June 2006. ¶67.

person in the position occupied by the source would possess the information alleged." *Id.* "To determine whether the complaint has done so, a court is to look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

### i.  CW1 and CW2

Defendants do not challenge the statements of CW1 or CW2 on the basis that the Complaint does not describe with particularity facts demonstrating the witnesses' reliability or personal knowledge of the facts alleged, nor could they.[6] These allegations are properly before the Court. *Zucco*, 552 F.3d at 981. To counter these powerful facts, Edson claim that the allegations are not indicative of Edson's state of mind. This argument makes no sense since CW1 and CW2 negotiated the terms of the Famous Discoveries transaction directly with Edson. ¶139 To accept Defendants' contention, the Court would have to believe that Edson did not know the accounting implications of a consignment sale: revenue is not earned unless (i) the product is shipped, and (ii) the buyer has an enforceable obligation to purchase the product. Edson's claimed ignorance of this fundamental accounting rule is simply implausible.

### ii.  CW3

CW3's allegations concerning the $2 million "bill and hold" sale in Q4 2007 are creditable. Contrary to Edson's argument, Plaintiffs need not allege CW3's title or background with particularity, because the allegations are based on CW3's personal

---

6   CW1 is the CEO and a founder of Famous Discoveries NutraCea's customer for the Q4 2006 $1.6 million transaction that was improperly recorded as revenue. ¶74. CW1 negotiated with Edson the terms of purported $1.6 million sale of Dr. Vetz PetFlex products in the infomercial markets. ¶¶47, 74. CW2 is founder and President of Famous Discoveries, and was also involved in negotiations with Edson concerning the $1.6 million transaction. ¶48. CW2 corroborated CW1's account that CW1 was primarily involved in negotiating the $1.6 million transaction on behalf of Famous Discoveries with Edson.

knowledge *and* are corroborated by other documentary evidence. *See Zucco*, 552 F.3d at 981 ("Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false").

CW3 is a percipient witness who, in June of 2008,[7] personally spoke to Robert Maihos, an officer and director and control person of ITV.[8] ¶¶ 49, 68c. The particularized facts about Mr. Maihos and ITV—one of NutraCea's largest customers (¶10)—show that CW3's account is reliable and accurate. These allegations include the quantity of product involved (even serving size), when the order was placed, the name of NutraCea's co-packer, when the orders were received by ITV, ITV's general business plan, and the like. ¶¶67-68. None of these facts are disputed by the Defendants. Moreover, CW3's account is also independently corroborated by the February 22, 2008 document posted on the Internet on an ITV related website which supports CW3's account that ITV had no business reason to request a "bill and hold" arrangement with NutraCea because such an arrangement would hurt ITV's ability to "up-sell" product on expedited shipments to customers. ¶68f, *cf.* ¶69.

CW's statements are further corroborated by NutraCea's admissions that NutraCea senior management provided improper explanations and supporting documentation to, the Company's Audit Committee and Board of Directors, as well as its independent registered public accountants.[9] Kim Decl., Ex. 1 at p. 72. *See Zucco*, 552

---

7   The telephone call took place in June 2008. ¶68c. Elsewhere in the Complaint, the Complaint mistakenly refers to the call taking place in June 2006. ¶67.

8   ITV, ITV Direct and Direct Marketing Concepts were affiliates of each other, shared the same office address, and had overlapping management.

9   Edson's reliance on *Weiss v. Amkor Tech., Inc.*, 527 F.Supp.2d 938, 948 (D. Ariz. 2007) is misplaced. *Amkor* dealt with confidential witnesses, some of whom were not even employed by the company during the relevant time period. *Id.*, at 954. Moreover, the allegations from the confidential witnesses "merely reflect[ed] matters that companies deal with on a daily basis" and "unsupported vague conclusions." *Id.* The confidential

F.3d at 981 (When corroborated, confidential witness' statements are reliable, and should be considered).

### G.    Additional Scienter Allegations

As discussed in Plaintiffs' Memoranda in opposition to Crow's motion to dismiss which Plaintiffs incorporate by reference as if fully set forth herein, Edson and Crow's departure, the SEC investigation, and Edson and Crow's Sarbanes-Oxley certifications, support a strong inference of scienter.

The $20 million offering: Defendants were also motivated to overstate revenue in order to inflate the Company's stock price for the purpose of completing its $20 million private offering of stock and warrants on April 30, 2008. The offering only a few weeks after the Company filed its false Q4 and FY 2007 results with the SEC on March 17, 2007.  Defendants' motive to inflate the Company's Stock price in order to complete the offering – and at a higher price -- supports a strong inference of scienter. *See Daou*, 411 F.3d at 1023-24 (the company "acquired 11 companies by exchanging over 6.6 million shares of . . . [its artificially inflated] stock. . . . When considered as a whole, plaintiffs' allegations are sufficient to create a strong inference that all defendants except Moragne acted with at least deliberate recklessness").[10]

Additionally the Company awarded an unusually large and rare cash bonus of $280,000 for successfully completing NutraCea's $20 million stock offering. ¶142c. Edson was also awarded an additional $70,000 bonus in November of 2008.  *See Kim Decl.*, Ex. 1 at p. 80.  *See No. 84 Employer-Teamster Joint Council Pension Trust Fund*

---

witnesses were also low level employees of the company proffered to submit the knowledge of higher level management. *Id.*

10    *See also Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (allegation that CEO and chairman of the board had motive to inflate sales to raise financing for company is probative of scienter); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269-70 (2d Cir. 1993) (upholding allegation that officers were motivated to conceal "consideration of [a] rights offering to maintain a high stock price prior to announcement of the new rights offering in order to lessen the dilutive effect").

1    *v. America West Holding Corp*, 320 F.3d 920, 944 (9th Cir. 2008) ("none of the

2    [defendant's] executive officers received options awards in 1997 . . . [but defendant]

3    awarded [thousands of options to executive officers] in March 1998 [for performance

4    allegedly increased by misrepresentations] . . . a strong inference of scienter can be

5    inferred from Plaintiffs' allegations"). *Tellabs*, 551 U.S. at 311 ("[P]ersonal financial

6    gain may weigh heavily in favor of a scienter inference"). This allegation, when viewed

7    together with the other allegations in the Complaint, is another piece in the scienter

8    puzzle.

9        <u>Edson's Stock Transactions</u>: Edson's contention his purchase of 79,000 shares for

10   about $40,000 six months before the restatement was announced undermines any

11   inference of scienter is ridiculous. While the Court can take judicial notice that Edson

12   filed Form 4s with the SEC, the Court cannot accept as true the matters set forth in the

13   Form 4s, *i.e.* that the forms truthfully represent all of Edson's transactions in NutraCea

14   stock during the Class Period. *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at * 2

15   (N.D. Cal. Dec. 4, 2008) (collecting cases). Any competing inference of nonculpability

16   that can be drawn from Edson's Form 4s are fully negated by the fact that Edson failed

17   to disclose that he received 1 million shares of Company stock in July 14, 2004. It was

18   not until September 17, 2007, following revelation of the grant on an internet message

19   board, that NutraCea publicly disclosed the stock was transferred to Edson's family

20   members. At no time did, Edson or NutraCea disclose whether that stock was ever sold

21   by the Edson's family members. ¶144-45.[11] Thus, Edson's reliance on his Form 4s does

22   not establish that he or his family members were not sellers of NutraCea stock during the

23   Class Period.

24       Moreover, Edson's suggested inference of nonculpability is further undermined

25   by his refusal to disclose to the Company his actual beneficial ownership in the

26

27   11   The 79,000 shares Edson allegedly bought is a mere pittance compared to the profits
     Edson's "family members" may have reaped on a million shares.
28

Company's stock. Indeed, in footnote in the October 20, 2009 10-K, the Company states that Edson's "requested [ownership] information was ***never*** furnished by individual." *See* Kim Decl., Ex. 1 at p. 104. (emphasis added).

## II.      PLAINITFFS ADEQUATELY ALLEGE EDSON'S CONTROL PERSON LIABILITY UNDER SECTION 20(A) OF THE EXCHANGE ACT

Because Plaintiffs have adequately alleged a primary violation by NutraCea, Edson is liable under Section 20(a) as a control person.

## III.     THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER A.R.S. § 44-1991(A)(3) AND § 44-2003(A)

For the reasons set forth in Plaintiffs' memorandum in opposition to Crow's motion to dismiss, Plaintiffs have adequately alleged their Arizona securities claims against Edson.

## CONCLUSION

For the foregoing reasons, the Court must deny Defendants' Motions to Dismiss.


Dated: November 4, 2009                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM P.A**.

                                           /s/ Phillip Kim
                                           Phillip Kim (*pro hac vice*)
                                           Laurence Rosen (*pro hac vice*)
                                           Timothy Brown (*pro hac vice*)
                                           350 Fifth Avenue, Suite 5508
                                           New York, NY 10118
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827

                                           Lead Counsel for Plaintiffs


                                           **TIFFANY & BOSCO, P.A.**
                                           Richard G. Himelrick (#004738)
                                           J. James Christian (#023614)

Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Fax: (602) 255-0103

Liaison Counsel for Plaintiffs

PLAINTIFFS' MEMORANDUM OF P&As IN OPPOSITION TO DEF EDSON'S MOTION TO DISMISS

**CERTIFICATE OF SERVICE**

I, Phillip Kim, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 350 5th Avenue, Suite 5508, NY, NY 10118.  I am over the age of eighteen.

On November 4, 2009, I electronically filed the following PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BRADELY EDSON'S MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on November 4, 2009

_____ /s/ Phillip Kim   _____