1 **WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer Burritt, et al., | No. CV-09-00406-PHX-FJM |
| Plaintiffs, | **ORDER** |
| vs. | |
| NutraCea, et al., | |
| Defendants. | |

## I. Background

The court has before it defendants Bradley Edson's and Todd Crow's motions to dismiss (docs. 63 & 59), plaintiffs' responses (docs. 71 & 72), and defendants' replies (docs. 77 & 78). We also have before us the parties' unopposed requests for judicial notice (docs. 61, 73, & 79).

**I. Background**

Plaintiff shareholders allege that defendants engaged in securities fraud while they were NutraCea executive officers. NutraCea is a public corporation that produces stabilized rice bran to sell as a nutritional supplement. Although originally a defendant, NutraCea filed for bankruptcy in November 2009, and the claims against it were dismissed without prejudice (doc. 85). During the relevant time period, Edson served as Chief Executive Officer, President, and a director. He resigned on March 10, 2009. Crow was NutraCea's Chief Financial Officer. He retired on November 6, 2008.

Plaintiffs focus on defendants' representations concerning four transactions completed between December 2006 and March 2008. They claim that defendants misled investors by attesting to the correctness of NutraCea's public financial statements, which improperly recognized over $9.6 million in revenue from the transactions. According to plaintiffs, defendants knew, or were deliberately reckless in not knowing, that NutraCea's accounting of the transactions violated Generally Accepted Accounting Principles ("GAAP") and the company's stated revenue recognition policies.

The complaint draws primarily on NutraCea's February and April 2009 public announcements of accounting errors related to the transactions. It also draws on NutraCea's financial statements, three confidential witnesses, defendants' comments during investor conference calls, their roles in the company, and the nature and monetary significance of the transactions. Due to improper revenue recognition from the four transactions, NutraCea announced that reported revenue and income from 2006 and 2007 would have to be restated. Revenue and income from 2006 required adjustment from $18.1 and $1.6 million to $16.5 and $0.3 million. Revenue and loss from 2007 required adjustment from $22.2 and $11.9 million to $14.2 and $17.2 million. The proposed revisions were more pronounced on a quarterly basis.

The first transaction involved a purported sale to Famous Discoveries in December 2006. NutraCea immediately recognized $1.6 million in revenue from the sale. In the second quarter of 2007, NutraCea recorded an $800,000 reserve because its ability to collect on the account was doubtful. In the third quarter of 2007, it reversed the sale by recording a $1.6 million sales return. In 2009, NutraCea announced that the sale should have been reversed in 2006 because, in part, the company lacked adequate evidence of collectability.

Through confidential witness statements from Famous Discoveries' CEO and President, plaintiffs allege that Edson negotiated the terms of this transaction. These statements suggest that it was essentially a consignment sale. NutraCea's arrangement with Famous Discoveries allegedly did not obligate Famous Discoveries to buy any product without first obtaining a firm purchase order or payment from a customer. The product

apparently remained in a warehouse under NutraCea's control. Under GAAP, such an arrangement would not permit immediate revenue recognition because the buyer is not obligated to purchase anything up front and the seller retains the risk of loss.

The second transaction was a $2.6 million sale in the second quarter of 2007. In the same quarter, NutraCea received a $1 million down payment and recognized the entire $2.6 million as revenue. The sale was subject to two $800,000 reserves in the third and fourth quarters of 2007. In 2009, NutraCea announced that the entire sale would need to be reversed. It said that its revenue recognition was improper because it had relied on inaccurate evidence of the customer's ability to pay and a NutraCea consultant and former officer funded the down payment through a loan. Plaintiffs believe that this person was Ike Lynch, who resigned as Chief Operating Officer on April 11, 2007.

Plaintiffs link this transaction to defendants through their statements during investor conference calls. During a May 2007 call, Edson said that there was a delay in recording revenue from the sale and that he was working with the company's accountants and outside auditors to ensure that revenue would be recognized as soon as possible in the future. During a November 2007 call, Crow explained that the company recorded the first $800,000 reserve because the customer was slow in paying and did not respond to several inquiries.

The third transaction was an agreement between NutraCea and Pacific Holdings Advisors Limited to license the production and sale of stabilized rice bran in Southeast Asia. In June 2007, Pacific Holdings agreed to a $5 million license fee payable to NutraCea after five years. NutraCea recognized the entire amount as revenue in the second quarter of 2007. In 2009, the company announced that immediate revenue recognition was improper because the companies retained continuing obligations under the agreement. In March 2008, Pacific Holdings prepaid the $5 million fee. At the same time, NutraCea funded a subsidiary's $8.2 million purchase of an Indonesian company's stock from Fortune Finance Overseas Limited. NutraCea recorded the value of the stock as $8.2 million. Because Pacific Holdings and Fortune Finance shared a principal shareholder, NutraCea announced in 2009 that the

transaction should have been accounted for as a combined event with the value of the stock reduced by the $5 million received from Pacific Holdings.

The fourth transaction involved a $2 million sale to ITV Global, Inc. in December 2007. NutraCea recognized the entire amount as revenue in the fourth quarter of 2007. The company later announced that the sale was made on a bill and hold basis. Under GAAP, early revenue recognition is more difficult when a seller retains possession of goods through a bill and hold arrangement. In order for a seller to recognize revenue, the buyer must request that the transaction be on a bill and hold basis. The buyer also must have a substantial business purpose to do so.

Plaintiffs allege that this transaction was fraudulent through statements from a confidential witness who recounts a June 2008 conversation with a co-owner of an ITV affiliate. The co-owner apparently said that a NutraCea executive asked him to sign and back date a bill and hold request letter in February 2008. According to the witness, the co-owner was also asked to represent that the order was complete and on hold, even though NutraCea was experiencing production problems and could not deliver the product on time. In order to corroborate this account, and to show that ITV did not have a business purpose to buy on a bill and hold basis, plaintiffs allege that ITV emailed its customers in February 2008 to apologize for delays due to the manufacturer's limitations.

Plaintiffs claim that defendants violated federal and Arizona law by fraudulently representing that NutraCea's accounting of these four transactions was correct, principally through financial statements filed on April 2, 2007, August 11, 2007, November 14, 2007, and March 17, 2008. The complaint contains four counts against each defendant. Count one alleges primary violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count two alleges control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Counts three and four allege primary violations of the Arizona Securities Act, A.R.S. § 44-1991(A)(3), and control person liability,

A.R.S. § 44-1999(B), through the Act's private cause of action, A.R.S. §§ 44-2001(A), -2003(A). Defendants move to dismiss all four counts for failure to state a claim.

## II. Judicial Notice

As an initial matter, the parties request judicial notice of a number of documents. On a motion to dismiss, we may consider unchallenged documents necessarily relied upon in a complaint. Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc., 633 F. Supp. 2d 763, 775 (D. Ariz. 2009). Pursuant to Rule 201, Fed. R. Evid., we may take notice of matters of public record, as long as the facts are not subject to reasonable dispute. In the context of securities fraud, courts often consider publically available financial documents on a motion to dismiss. See id. at 776.

All of the parties request judicial notice of NutraCea's financial statements filed with the SEC. Defendants' Joint Request ("DJR"), Exs. 1 & 10; Kim Declaration, Exs. 1 & 2. They also request judicial notice of reports and registration forms filed with the SEC and NutraCea's historical stock prices. DJR, Exs. 2, 3, 4, 6, 8, 9, 11, & 12; Kim Declaration, Exs. 3, 4, 5, & 6; Defendants' Joint Supplemental Request, Ex. 1. Finally, defendants request judicial notice of NutraCea's press release announcing Edson's resignation and a publically available May 1, 2009 letter to shareholders announcing that NutraCea's stock would no longer be traded on the Over-The-Counter Bulletin Board. DJR, Exs. 5 & 7. The parties do not challenge the authenticity of any of these documents. We take judicial notice of all of them.

## III. Section 10(b) of the Exchange Act

Defendants move to dismiss plaintiffs' Section 10(b) and SEC Rule 10b-5 claims. Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security, when it would contravene SEC rules. 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person:

> (a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Under Section 10(b) and Rule 10b-5, plaintiffs must state a prima facie case with the following elements: (1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157, 128 S. Ct. 761, 768 (2008) (citation omitted). Pursuant to Rule 9(b), Fed. R. Civ. P., they also must plead circumstances constituting fraud with particularity. Defendants challenge plaintiffs' Section 10(b) and Rule 10b-5 claims on the elements of scienter, reliance, and loss causation.

## A. Scienter

Defendants argue that plaintiffs have not adequately alleged scienter. Under Section 10(b) and Rule 10b-5, plaintiffs must allege that defendants "made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (citation omitted). Moreover, plaintiffs' scienter allegations are subject to a heightened pleading requirement. Under the Private Securities Litigation Reform Act of 1995, private plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To qualify as strong, an inference of scienter, "must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 2504-05 (2007).

Thus, the scienter inquiry in this case turns on what defendants knew about the proper accounting of the four transactions when they represented that NutraCea's accounting was correct. We review plaintiffs' scienter allegations individually at first, and then collectively

to determine whether otherwise insufficient allegations combine to create a strong inference of scienter. Zucco Partners, 552 F.3d at 992.

Plaintiffs allege that Edson personally negotiated the first transaction with Famous Discoveries. When pleading scienter, individualized allegations of "specific contemporaneous statements or conditions" are critical. See Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1066 (9th Cir. 2008). Plaintiffs rely on confidential witnesses to show that Edson was aware of circumstances inconsistent with immediate revenue recognition, such as the absence of an obligation to buy and NutraCea's retention of the risk of loss. In order to use confidential witnesses, plaintiffs must describe them "with sufficient particularity to establish their reliability and personal knowledge," and the statements they offer must be indicative of scienter. Zucco Partners, 552 F.3d at 995. Plaintiffs' witnesses satisfy the first requirement because they are presented as the CEO and President of Famous Discoveries and they base their statements on alleged personal contact with Edson. They satisfy the second requirement because their statements indicate that Edson knew the terms of the transaction.

In response, Edson contends that the statements are not described with sufficient particularity under Rule 9(b), Fed. R. Civ. P. Portions of the complaint do not meet this standard. Plaintiffs include a conclusory statement that Edson fraudulently concealed the terms of the transaction, but they fail to provide any detail. We do not credit this statement. The confidential witnesses' statements, however, are pled with particularity. They describe the relevant actors and the content of the conversations in sufficient detail. We conclude that Edson's personal knowledge of the Famous Discoveries transaction, at the time NutraCea recognized revenue from it, is highly indicative of scienter.

Plaintiffs also allege that Edson had personal knowledge of the second transaction involving a related-party loan to purchase $2.6 million in NutraCea product. They rely on Edson's conference-call admission that he was monitoring the transaction and working with the company's accountants and auditors. Edson's statements do not demonstrate that he knew the transaction was funded by a former NutraCea officer. They do support an inference

of scienter, however, because they show that he was following the timing and validity of NutraCea's revenue recognition decisions.

Plaintiffs' specific allegations of Crow's personal knowledge are more limited. The confidential witnesses do not mention Crow. Plaintiffs contend that his explanation that a reserve was necessary for the second transaction because the customer was slow paying and unresponsive supports an inference of scienter. As with Edson, Crow's statements only show that he was familiar with the transaction. They do not show that he knew it was funded through a related-party loan. Plaintiffs also allege Crow's involvement in a remedial plan set out in NutraCea's 2007 financial statement acknowledging a material weakness in the company's internal control over financial reporting as of December 31, 2007. See Kim Declaration, Ex. 2 at 36-38. The remedial plan indicates that Crow played a prominent role in NutraCea's accounting decisions, but it does not indicate that he had significant personal knowledge of the transactions at issue. Plaintiffs' allegations of personal knowledge against Crow are weakly probative of scienter.

Plaintiffs allege that Edson had a motive to inflate NutraCea's revenue numbers. According to plaintiffs, NutraCea completed a $20 million private placement in April 2008, one month after filing a 2007 financial statement improperly recognizing about $8 million in revenue. On the same day the private placement was announced, Edson allegedly received a $280,000 cash bonus. It exceeded his $255,769 salary for 2007. Plaintiffs claim that NutraCea did not ordinarily pay cash bonuses. Typical incentive-based compensation is not probative of scienter because it is common place. However, personal financial gain based principally on a company's financial performance may support an inference of scienter. See Zucco Partners, 552 F.3d at 1004-05. The circumstances surrounding Edson's alleged bonus are probative of scienter because they show a motive to commit securities fraud.

Edson counters plaintiffs' motive allegations with SEC filings showing that he purchased 5,000 shares of NutraCea stock in June 2007 for $16,500, and another 74,000 shares in August 2008 for about $42,000. Edson maintains that increasing his position in NutraCea stock indicates that he did not believe that the stock price was inflated due to

improper revenue recognition. Plaintiffs contend that such an inference is unwarranted because Edson's SEC filings do not present a complete picture of his position in NutraCea stock. They allege that the company issued one million shares to Edson's relatives in 2004. On these facts, Edson's increasing stock position only weakly supports an innocent inference.

Plaintiffs do not present a specific motive allegation against Crow. Through SEC filings, Crow represents that he did not sell any of his 9,700 shares of NutraCea stock. Plaintiffs respond that such a small position does not merit an inference either way. The absence of any motive for Crow to commit securities fraud is probative of a lack of scienter.

Plaintiffs make a number of generalized allegations against both defendants concerning the importance and nature of the transactions. "[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter." In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). Plaintiffs provide detailed descriptions of substantial GAAP violations. They allege that NutraCea improperly recognized $9.6 million in revenue out of an originally reported $40.3 million over 2006 and 2007. The transactions varied in complexity, but each violation involved recognizing revenue prematurely. Plaintiffs also allege that NutraCea violated its own accounting policies. The magnitude and nature of NutraCea's GAAP and company policy violations are indicative of scienter.

Plaintiffs generally allege that the transactions themselves suggest fraudulent intent. According to plaintiffs, the first transaction was actually a consignment sale. The second involved a secret loan from a former NutraCea officer. The third consisted of $5 million making a round trip between two companies with the same principal shareholder. And the fourth implicated a NutraCea executive in creating a nonexistent bill and hold arrangement through a fraudulent request letter.

For this last allegation, plaintiffs depend on a confidential witness described only as someone who had a phone conversation with a co-owner of an ITV affiliate. They do not explain why this person was in a position to talk with the co-owner. A confidential witness's reliability may be corroborated through other facts. Zucco Partners, 552 F.3d at 995.

Reporting hearsay does not automatically disqualify a confidential witness, but it may weigh against reliability. Id. at 998 n.4. Plaintiffs contend that their witness is reliable because his statements are detailed and his account of NutraCea's production problems is corroborated by ITV's customer email. This is insufficient to establish the reliability of a completely unidentified hearsay declarant. While the alleged email suggests that ITV lacked a substantial business purpose for a bill and hold arrangement, we will not consider the confidential witness statements concerning the bill and hold request letter.

The alleged surreptitious nature of the first three transactions cuts in both directions. It supports an inference of fraudulent intent, but it also supports an inference that individuals without personal knowledge of the transactions would not necessarily have known that NutraCea's accounting was improper. See Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 746-47 (9th Cir. 2008) (finding surreptitious nature of illegal payments made it equally likely that they were keep secret within a company). Indeed, Edson points out that NutraCea's outside auditors signed off on its financial statements, which suggests an absence of obvious red flags. Plaintiffs contend that this does not support an innocent inference because the company announced recently that information was concealed from its board and outside auditors. While this announcement undermines an innocent inference from the auditor reports, it further highlights the importance of individualized allegations of scienter in this case. Because Edson's personal involvement is alleged with greater particularity, the nature of the transactions is more indicative of Edson's scienter than it is of Crow's.

Next, plaintiffs allege that defendants' executive positions at NutraCea support a strong inference of scienter. An individual's managerial role in a company's core operations is insufficient to plead scienter unless combined with particular allegations that he had actual access to the information at issue or a showing that it would be absurd to suggest that management was without knowledge of the matter. Zucco Partners, 552 F.3d at 1000. Given the surreptitious nature of plaintiffs' allegations, they cannot meet the second exception because it is not "patently obvious" that defendants would have known NutraCea's accounting was improper from the company's operations alone. Id. at 1001. With respect

to Edson, they come close to establishing a core operations inference under the first exception because they allege that he had particular knowledge of the Famous Discoveries transaction. But plaintiffs do not tie Edson directly to the facts of the other three transactions. They also fail to allege that Crow had sufficient personal knowledge of the transactions to meet the first exception. While plaintiffs cannot rely on a core operations inference, defendants' roles at NutraCea will still be relevant under the collective review for scienter.

Plaintiffs' remaining scienter allegations are not particularly useful. They allege that Edson's resignation with a reduced buyout following NutraCea's announcement of accounting errors indicates scienter. This is insufficient to rebut the reasonable assumption that he was forced out because the disclosed accounting errors occurred during his watch. Cf. id. at 1002 (establishing reasonable assumption for resignations near restatements). Similarly, Crow's ultimate retirement after several failed attempts to find a permanent replacement is not suspicious enough to warrant an inference of scienter. Plaintiffs also claim that the SEC's formal investigation of NutraCea's accounting is indicative of scienter. But the mere existence of an ongoing investigation does not show scienter. See In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (discussing loss causation). Plaintiffs' final scienter allegation is based on defendants' Sarbanes-Oaxley certifications contained in NutraCea's financial statements. "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." Glazer Capital, 549 F.3d at 747. Thus, defendants' certifications add little to the scienter inquiry.

Although none of plaintiffs' allegations is sufficient to support a strong inference of scienter against either defendant, we must also review the allegations as a whole. We conclude that plaintiffs' allegations that Edson negotiated the Famous Discoveries transaction, monitored NutraCea's revenue recognition, and had a profit motive, when combined with the general allegations, create a strong inference of scienter. This inference is cogent and at least as compelling as an inference that Edson was merely reckless or

negligent. The collective analysis tips in the other direction for Crow. Plaintiffs lack particular allegations about his knowledge of the transactions or his motive to commit securities fraud. Even taken together, their general allegations concerning the accounting violations, the nature of the transactions, and Crow's position at the company do not present a strong inference of scienter. Because plaintiffs only adequately plead scienter against Edson, we grant Crow's motion to dismiss on plaintiffs' Section 10(b) and Rule 10b-5 claim.

### B. Reliance

Edson also challenges plaintiffs' Section 10(b) and Rule 10b-5 claim on the element of reliance. Specifically, he contends that plaintiffs cannot establish a fraud-on-the-market presumption of reliance because NutraCea's stock did not trade in an efficient market. According to the fraud-on-the-market theory, when a stock trades in an efficient securities market where prices reflect public information, investors rely on the market price set by a material misleading statement even if they do not rely on the statement itself. Basic Inc. v. Levinson, 485 U.S. 224, 241-42, 108 S. Ct. 978, 989 (1988). The parties agree that five factors are helpful when determining a market's efficiency: (1) whether the stock trades at a high weekly volume, (2) whether securities analysts follow and report on the stock, (3) whether the stock has market makers, (4) whether the company is eligible to file an SEC S-3 registration statement, and (5) whether there are facts showing a causal relationship between unexpected corporate events and an immediate response in the stock price. Binder v. Gillespie, 184 F.3d 1059, 1065 (9th Cir. 1999) (citing Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

During the relevant time period, NutraCea's stock traded on the OTC Bulletin Board, which is not a major stock exchange. Plaintiffs allege that 3.7% of NutraCea's outstanding shares traded on a weekly basis, and two securities analysts and thirty market makers were involved with the stock. They also allege S-3 registration eligibility, which demonstrates that a company meets certain SEC size and filing history requirements. Most importantly, they show a swift market response to NutraCea's announcements in the spring of 2009. In February 2009, after NutraCea first announced its accounting errors in connection with two

of the transactions, NutraCea's stock price dropped from $0.35 to $0.25 on heavy trading. When Edson resigned in March 2009, it rallied from $0.19 to $0.26 on heavy trading. And when the company announced the other two transactions in April 2009, its stock price rallied again from $0.20 to $0.22 on average trading.

In response, Edson argues that NutraCea's trade volume should be discounted and the number of analysts and market makers is low. He also argues that S-3 eligibility means less because the SEC lowered its registration requirements and that a price rally in response to negative news suggests an inefficient market. At the pleading stage, plaintiffs need only allege an efficient market. Given NutraCea's weekly trade volume and the market's immediate response to public information, we conclude that plaintiffs adequately allege an efficient market. Thus, we reject Edson's challenge to plaintiffs' use of the fraud-on-the-market presumption to plead reliance.

**C. Loss Causation**

Finally, Edson challenges plaintiffs' Section 10(b) and Rule 10b-5 claim on the basis of loss causation. Because the Exchange Act protects investors against losses actually caused by securities fraud, instead of providing them with broad insurance against market losses, plaintiffs must show that Edson proximately caused their loss. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345, 125 S. Ct. 1627, 1633 (2005). At the pleading stage, they must offer sufficient detail to give Edson ample notice of their loss causation theory and provide some assurance that the theory has a basis in fact. See In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1056 (9th Cir. 2008) (quotation omitted).

Edson contends that plaintiffs have not met their burden to plead loss causation. Plaintiffs claim that NutraCea's revelation of accounting errors caused their losses. As above, they allege that NutraCea's stock price dropped significantly after the company's February 2009 announcement that it had uncovered improper revenue recognition. The company also announced that its review was ongoing and further disclosures were possible. In April 2009, it followed up with an announcement disclosing two additional transactions

involving improper revenue recognition. These detailed allegations give Edson notice of plaintiffs' theory, and they suggest a basis in fact.

With respect to the first announcement, Edson repeats his contention that NutraCea's stock did not trade in an efficient market. He asserts that this precludes any causal connection between the announcement's disclosures and plaintiffs' losses. His contention fails because plaintiffs have alleged an efficient market. With respect to the April 2009 announcement, Edson argues that plaintiffs cannot rely on the accounting errors it revealed because it was not followed by a decrease in NutraCea's stock price. However, "loss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements." Teamsters Local 617, 633 F. Supp. 2d at 823 (quotation omitted). If complete disclosures were required, defendants could immunize themselves through a series of partial disclosures. Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009) (quotation omitted). The market's muted response to NutraCea's second announcement does not render plaintiffs' theory implausible because they allege that the partial revelations from the first announcement caused their losses. We conclude that plaintiffs' loss causation theory is sufficient to survive a motion to dismiss.

We have rejected all three of Edson's challenges to plaintiffs' Section 10(b) and Rule 10b-5 claim. Therefore, we deny his motion to dismiss on this claim.

**IV. Section 20(a) of the Exchange Act**

Next, defendants move to dismiss plaintiffs' Section 20(a) claims. Section 20(a) of the Exchange Act extends joint and several liability, along with an affirmative defense, to every person who controls a primary violator of the Exchange Act. 15 U.S.C. § 78t(a). Defendants contend that plaintiffs' Section 20(a) claims fail because they cannot state a primary violation of the Exchange Act against a controlled person.

Plaintiffs allege that both Edson and Crow controlled NutraCea, the primary violator. Defendants do not challenge their control of NutraCea. They dispute plaintiffs' ability to state the required primary violation. A well pled Section 10(b) and Rule 10b-5 claim against a corporate officer is sufficient to state a primary violation against the corporate entity itself.

- 14 -

Glazer Capital, 549 F.3d at 744. We have sustained plaintiffs' Section 10(b) and Rule 10b-5 claim against Edson, NutraCea's former CEO. Thus, plaintiffs adequately plead NutraCea as a controlled primary violator, with defendants as control persons. Accordingly, we deny defendants' motions to dismiss on plaintiffs' Section 20(a) claims.

## V. Arizona Securities Act

Defendants also move to dismiss plaintiffs' remaining claims under Arizona securities law, which include primary violations, A.R.S. § 44-1991(A)(3), and control person liability, A.R.S. § 44-1999(B). These provisions are similar to their counterparts in federal securities law. The Arizona Securities Act makes it unlawful for a person to engage directly or indirectly, "in any transaction, practice or course of business which operates or would operate as a fraud or deceit," in connection with transactions within or from Arizona involving "an offer to sell or buy securities, or a sale or purchase of securities." A.R.S. § 44-1991(A)(3). It also extends liability to every person who controls a primary violator of A.R.S. § 44-1991(A)(3). A.R.S. § 44-1999(B). Unlike federal law, the Act includes an explicit private cause of action with certain limitations. This cause of action allows purchasers to void securities sales made unlawful by the Act and seek recission or damages. A.R.S. § 44-2001(A). The Act extends private civil liability beyond the parties to the sale, but only to persons "who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44-2003(A). Thus, to recover from a primary violator of A.R.S. § 44-1991(A)(3) or a control person under A.R.S. § 44-1999(B), a private plaintiff must show that the primary violator, whether controlled or not, made, participated in, or induced the sale or purchase. Grand v. Nacchio, 222 Ariz. 498, ¶ 17, 217 P.3d 1203, 1208 (Ct. App. 2009) (holding that a controlled person must meet the requirements of A.R.S. § 44-2003(A) in a private action). Defendants contend that plaintiffs fail to adequately allege that they, or NutraCea as a controlled person, made, participated in, or induced plaintiffs' securities purchases.

Plaintiffs allegedly purchased NutraCea securities in the secondary market.[1] They do not allege that defendants or the company made these sales, which leaves only participation and inducement theories. The Arizona Court of Appeals recently affirmed that "'participated in,' for purposes of A.R.S. § 44-2003(A), means 'to take part in something' or 'have a part or share in something.'" Id. ¶ 8, 1205-06 (quoting Standard Chartered PLC, v. Price Waterhouse, 190 Ariz. 6, 21, 945 P.2d 317, 332 (Ct. App. 1996)). In Grand, plaintiff trustees alleged, in part, that defendant corporate executives and entities targeted them with reassuring emails concerning market conditions, favorable analyst reports, and press releases, and misled investors through a fraudulent scheme. Id. ¶ 9, 1206. The court found these allegations insufficient to plead defendants' participation in the plaintiffs' secondary market purchases. Id. ¶ 10, 1206. Here, plaintiffs' allegations of participation are more attenuated than those in Grand. Plaintiffs do not allege that defendants took part in, or had a share in, their secondary market purchases. We agree with defendants that plaintiffs' state law claims cannot proceed on a participation theory.

In response, plaintiffs advance an inducement theory. Under A.R.S. § 44-2003(A), inducement has the narrow and active meaning suggested by "persuade" and "prevail." Standard Chartered PLC v. Price Waterhouse, 190 Ariz. 6, 21, 945 P.2d 317, 332 (Ct. App. 1996). It does not sweep as broadly as the "in connection with a transaction" language of A.R.S. § 44-1991(A). Id. at 22, 333. For example, it does not reach outsiders to a securities sale who merely provide information that foreseeably contributes to, and thereby influences, a purchaser's decision to engage in a transaction. Id. (holding that an outside auditor did not induce a sale by providing false and misleading financial information).

Defendants maintain that plaintiffs' allegations that they provided false and misleading financial information about NutraCea to investors are insufficient to plead the

---

[1] We note that plaintiffs, who are from Florida, Massachusetts, and Texas, do not explicitly claim that they purchased NutraCea securities in transactions "within or from" Arizona. A.R.S. § 44-1991(A). The parties are advised to address this issue on any motion for class certification.

active inducement required under A.R.S. § 44-2003(A). They also point out that the complaint does not explicitly mention inducement. Plaintiffs' allegations, however, are specific enough to give defendants fair notice of an inducement theory. Moreover, plaintiffs do not merely rely on defendants' provision of financial information. They also allege that defendants made false and misleading statements designed to reassure investors during investor conference calls. Under the circumstances, we conclude that this is sufficient to plead inducement under A.R.S. § 44-2003(A). Therefore, we deny defendants' motions to dismiss on plaintiffs' Arizona Securities Act claims.

Accordingly, **IT IS ORDERED DENYING** Bradley Edson's motion to dismiss (doc. 63).

**IT IS FURTHER ORDERED GRANTING IN PART** and **DENYING IN PART** Todd Crow's motion to dismiss (doc. 59). It is granted on plaintiffs' Section 10(b) and Rule 10b-5 claim. It is denied on all others.

Plaintiffs' Section 10(b) and Rule 10b-5 claim against Edson and Section 20(a) and Arizona Securities Act claims against Edson and Crow remain.

DATED this 24th day of February, 2010.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge