**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick (#004738)
J. James Christian (#023614)
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Fax: (602) 255-0103
rgh@tblaw.com
jjc@tblaw.com

Liaison Counsel for Plaintiffs

**THE ROSEN LAW FIRM P.A.**
Phillip Kim (*pro hac vice*)
Laurence Rosen (*pro hac vice*)
Timothy Brown (*pro hac vice*)
350 Fifth Avenue, Suite 5508
New York, NY 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
tbrown@rosenlegal.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| JENNIFER BURRITT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br>vs.<br><br>NUTRACEA, BRADLEY D. EDSON, TODD C. CROW, AND DAVID BENSOL,<br><br>    Defendants. | No. CV-09-00406-PHX-FJM<br>(**Consolidated**)<br>CLASS ACTION<br><br>PLAINTIFFS' MOTION IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION |

Pursuant to Fed. R. Civ. P. 23(e), court-appointed Lead Plaintiff Harvey Pensack and Named Plaintiffs Jennifer Burritt and Jose Medrano (collectively "Plaintiffs") seek an Order and Judgment of this Court certifying the Settlement Class and approving the Settlement of this action, as set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), filed May 17, 2010 between the parties, as fair, reasonable and adequate. This action has been settled for a present cash payment $1,500,000 and fifty percent (50%) of any funds remaining in the Defendants' directors and officers liability insurance policy issued by Carolina Casualty Insurance Company (the "Insurance Policy" or "Policy") following resolution of the ongoing SEC investigation and any related claims covered by the Policy.

In support of this Motion for Final Approval, Plaintiffs submit the following Memorandum of Points and Authorities, and the Declaration of Laurence Rosen, filed herewith.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION[2]

The Settlement was achieved only after hard-fought litigation and investigation by Lead Counsel and Liaison Counsel working under the direction of Lead Counsel. This Litigation was carefully investigated and vigorously litigated from start to finish. Throughout this Litigation, Defendants have asserted aggressive defenses and have maintained that Plaintiffs could not prevail on their claims.  The Settlement was not achieved until Plaintiffs and their counsel (a) reviewed and analyzed publicly available information about NutraCea, including the Company's SEC filings, news articles, conference call transcripts and audio files, analyst reports, and stock trading data; (b) with the assistance of consulted with and retained experts in forensic accounting,

---

1  The Declaration of Laurence Rosen provides a factual predicate for both this motion and Plaintiffs' Motion for an Award of Attorneys'' Fee and Reimbursement of Expenses,
2  Unless otherwise defined, capitalized terms herein have the same meanings attributed to them in the Stipulation and Agreement of Settlement.

1

damages, loss causation, and market efficiency; (c) with the assistance of consultants that, located, identified and reviewed numerous witnesses including former NutraCea employees and customers with knowledge of Plaintiffs' allegations; (d) successfully opposed Defendants' motions to dismiss; (e) appeared and preserved Plaintiffs' and the Class' rights in bankruptcy court in connection with NutraCea's bankruptcy, including successfully opposing Defendants' request to stay this Litigation as to all Defendants, filing a proof of claim, and instituting an adversary proceeding; (f) researched, drafted and filed a class certification motion; (g) conducted extensive paper discovery, including review of thousands of pages of documents obtained from Defendants and others; (h) prepared for and participated in extensive settlement negotiations with the aid of Judge Eugene Lynch (Ret.), and (j) negotiated and drafted the stipulation of settlement and notice to class members.

To date, 28,452 claim packets, including the detailed "Notice of Pendency and Settlement of Class Action," ('the "Notice") and "Proof of Claim and Release" form have been sent by first-class mail to potential Settlement Class Members, and a Summary Notice has been timely published in *Investor's Business Daily* and through *PRNewswire*. *See* Declaration of Paul Mulholland CPA CVA Concerning Mailing of Notice of Pendency and Settlement of Class Action and Proof of Claim and Release Form ("Mulholland Aff."), ¶¶ 4, 7 (attached as Exhibit 1 to the Declaration of Laurence M. Rosen in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and for Award of Attorneys' Fees and for Reimbursement of Expenses ("Rosen Decl.")).  The deadline to object to any aspect of the Settlement, and to request exclusion has passed.  To date, there have been 8 requests for exclusion and two objections. Mulholland Aff., ¶ 9.

As detailed in the Rosen Declaration, the Settlement represents a realistic assessment by knowledgeable and experienced attorneys of the risks of further proceedings, including that NutraCea is a bankrupt micro-cap company with no history

1  of profitability, and no realistic means to tap the capital markets or other means to satisfy
2  a greater judgment.  The Settlement confers an immediate and substantial benefit on the
3  Settlement Class and eliminates the risk, expense and uncertainty of continued litigation
4  under circumstances where a more favorable outcome was at great risk.  By any
5  objective measure, the Settlement is fair, reasonable, and adequate.

6  **I.   THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT AS
7        FAIR, REASONABLE AND ADEQUATE TO THE CLASS**
8        **A. Standards of Review**
9        Federal Rule of Civil Procedure 23(e) provides that "[t]he court must approve any
10 settlement, voluntary dismissal, or compromise of the claims, issues, or defenses." In
11 deciding whether to approve a proposed settlement, the Ninth Circuit has a "strong
12 judicial policy that favors settlements, particularly where complex class action litigation
13 is concerned." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998);
14 *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  Consequently, in
15 making its assessment pursuant to Rule 23(e), the Court's intrusion upon what is
16 otherwise a private consensual agreement negotiated between the parties to a lawsuit
17 must be limited to the extent necessary to reach a reasoned judgment that the agreement
18 is not the product of fraud or overreaching by, or collusion between, the negotiating
19 parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all
20 concerned. *Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615, 625 (9th Cir.
21 1982); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000);
22 *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

23       There is no prescribed settlement approval procedure to be followed in this
24 Circuit. Rather, the ultimate decision is within the "sound discretion of the district courts
25 to appraise the reasonableness of particular class-action settlements on a case-by-case
26 basis." *Evans v. Jeff D.*, 475 U.S. 717, 742 (1986); *see also Hanlon*, 150 F.3d at 1011,
27 1025. To avoid excessive intrusion into the parties' compromise, the court considers the
28

1 settlement taken as a whole, rather than its individual component parts, and examines it
2 for overall fairness. *Officers for Justice*, 688 F.2d at 628. Consequently, a settlement
3 hearing is "not to be turned into a trial or rehearsal for trial on the merits," nor should the
4 proposed settlement "be judged against a hypothetical or speculative measure of what
5 might have been achieved by the negotiators." *Id.* at 625. To the contrary, "[t]he
6 involvement of experienced class action counsel and the fact that the settlement
7 agreement was reached in arm's length [sic] negotiations, after relevant discovery had
8 taken place create a presumption that the agreement is fair." *Linney v. Alaska Cellular*
9 *P'ship*, 1997 WL 450064, *5 (N.D. Cal. July 18, 1997), *aff'd.*, 151 F.3d 1234 (9th Cir.
10 1998); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd.*, 661
11 F.2d 939 (9th Cir. 1981).

12 As explained below, the Settlement was reached after extensive investigation and
13 litigation by experienced counsel on both sides, and then only after protracted arms-
14 length negotiations. Under these circumstances, the Settlement should be afforded the
15 presumption of fairness.

16 **B. All of the Relevant Considerations Employed by Courts in This Circuit
17 Favor Approval of the Proposed Settlement**

18 To determine whether a proposed settlement is fair, reasonable, and adequate, a
19 court must examine the following factors: (1) the strength of the plaintiffs' case; (2) the
20 risk, expense, complexity, and likely duration of further litigation; (3) the risk of
21 maintaining class action status throughout the trial; (4) the amount offered in settlement;
22 (5) the extent of discovery completed and the stage of the proceedings; (6) the
23 experience and views of counsel; (7) the presence of a governmental participant; and (8)
24 the reaction of the class members to the proposed settlement. *Linney*, 151 F.3d at 1242;
25 *Hanlon*, 150 F.3d at 1026. While these factors need to be explored comprehensively
26 when a settlement is reached prior to formal class certification, *Mego*, 214 F.3d at 458,

as applied to the instant action, these factors all point toward approval of the proposed Settlement.

### 1. Strength of Plaintiffs' Case/ The Risk, Expense, Complexity and Likely Duration of Further Litigation

While Plaintiffs' largely defeated Defendants' motion to dismiss, Plaintiffs and the Class faced serious obstacles to recovery at the proof stage because of issues of liability and damages. *E.g.*, Rosen Decl., ¶¶ 31-41. The primary claims in this action were based on Section 10(b) of the Securities Exchange Act of 1934 and under A.R.S. § 44-1991(A)(3) of the Arizona Securities Act under the theory that Defendants induced the Plaintiffs and the Class purchase of NutraCea stock. Under the Section 10(b) claims Plaintiffs would have to prove that Defendants were responsible for the issuance of materially false and misleading statements and the omissions of fact in connection with NutraCea's stock, that the Class relied upon Defendants' misconduct, that each Defendant acted with scienter- i.e. fraudulent intent, and that the Class suffered damages. With respect to the Arizona Securities Act claims Plaintiffs would likewise be required to provide materially false statements and omissions and whether Plaintiffs and the Class were induced by such misstatements and omissions. *See gen.*, Rosen Decl., ¶¶ 8, 31-41; *Burritt v. NutraCea*, 2010 WL 668806 (D. Ariz. Feb. 25, 2010).

While Plaintiffs believe they have arguments and evidence to support these claims, establishing liability at trial would be by no means guaranteed. *See In re Heritage Bond Litig.*, 2005 WL 1594403, at * 7 (C.D. Cal. June 10, 2005) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."). (quoting *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970)).

A review of the critical issues listed above reveals that further litigation would be expensive, complex and uncertain. Plaintiffs alleged that Defendants engaged in accounting fraud in connection with revenue recognition. Plaintiffs would have the

difficult task of proving that the misstatements arising from the accounting errors were made with scienter, i.e. fraudulent intent. To that end, Plaintiffs would have presented expert testimony in support. Defendants would have attempted to demonstrate, through experts, that the accounting errors were of the kind that do not approximate fraudulent intent but rather grossly negligent or negligent mistakes. *See* Rosen Decl., ¶ 33. Likewise, through expert testimony, Plaintiffs would have to prove loss causation and damages. Particularly, that the revelation of the fraud caused the price of NutraCea's stock to fall. Defendants would have presented, their own expert testimony, to demonstrate that the alleged stock drops were not the proximate cause of the revelation of the fraud or attempt to demonstrate that a portion of the alleged stock drops were attributable to things unrelated to the fraud or general market movement. *See* Rosen Decl., ¶¶ 34-35.

Consequently, expert discovery and trial preparation would be expensive and complex. While certainly attainable, victory in such a complex trial is hardly assured:

> In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.

*In re Warner Comm. Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985); *see also Heritage*, 2005 WL 1594403 at *6 (noting that class actions have a well- deserved reputation as being the most complex) (citation omitted); *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (same).

Defendants also attacked the fraud-on-the market presumption of reliance. While the Court found Plaintiffs had stated facts sufficient to allege the requisite efficient market to invoke the fraud-on-the-market presumption of reliance, whether the NutraCea's stock traded in an efficient market would likewise be subject an uncertain "battle of the experts." *See* Rosen Decl., ¶ 40.

Setting aside the difficulties in proving Plaintiffs claims, pragmatic considerations dictate that settlement as this time is in the best interest of the Class.

1 There is very limited insurance coverage available in this action, a single $5 million
2 wasting Insurance Policy. At the time settlement negotiations *began* NutraCea made
3 representations to the Bankruptcy Court that only $3.5 million of Policy remained. The
4 Insurance was not only being depleted from this litigation, but also from the ongoing
5 SEC investigation of the defendants Crow and Edson and several other former officers
6 and directors of NutraCea. *See* Rosen Decl., ¶¶ 36-37.

Additionally, NutraCea is a micro-cap company, with few liquid assets. Therefore, even if the Company successfully emerges from bankruptcy, the likelihood the Company could satisfy a judgment or issue equity to satisfy a judgment was unlikely. Moreover, both Edson and Crow's wealth was directly tied to their ownership, of the now worthless stock of NutraCea. As a result, resolving this case now is in the best interest of the Class because further litigation would require substantial amount of attorney time and expense which would only further deplete the available insurance leaving nothing to fund a settlement of judgment. *See* Rosen Decl., ¶ 39. Indeed, in *Linney*, 151 F.3d at 1242, the Ninth Circuit explained that the financial condition of a defendant, alone, can be determinative with respect to settlement approval.

Moreover, Plaintiffs were faced with a paradox in this Litigation, because if Plaintiff did prove that Defendants acted with scienter, i.e. knowingly and intentionally, it increased the likelihood that Defendants' insurer would successfully disclaim coverage under the intentional acts exclusion in the Insurance Policy. *See* Rosen Decl., ¶ 38. Therefore, as Plaintiffs were to move toward proving their case, the risk of non-payment by the insurer increased through this exclusion.

### 2. The Amount Offered in the Settlement

Defendants' payment of $1,500,000 in cash to the Class will provide a very fair and reasonable recovery under the circumstances. The Settlement also provides for the cash payment of 50% of the remaining amounts of Defendants' Insurance above

1 $150,000. This contingent amount will not be paid until all claims under the Policy are
2 finally resolved.

3 According to Plaintiffs' calculation, Class Members' estimated damages in this
4 case are approximately $28.9 million. *E.g.*, Rosen Decl., ¶ 21. Thus, the percentage
5 recovery for Class Members will be approximately 5% of their best case scenario of
6 damages under the Exchange Act. *Id.* Settlements with similar percentages have been
7 approved. *See* Stephanie Plancich et al., "2008 Trends: Subprime and Auction-Rate
8 Cases Continue to Drive Filings, and Large Settlements Keep Averages High," at pp.
9 22-23, available at www.nera.com, (July 2008) (noting that "the median annual ratio of
10 settlement size to investor losses has fallen from 7.1% in 1996 to the 2.2% to 3.2%
11 range since 2002"); *In re Cendant Corp. Sec. Litig.*, 109 F.Supp. 2d 235, 245 (D.N.J.
12 2000)(citing: (1) study of 377 securities class action settlements which found that the
13 average settlement comprises between 9% and 14% of claimed damages and (2) cases
14 which settled for 1.6% - 10% of claimed damages). Furthermore, the settlement amount
15 is fair, adequate and reasonable given the standard for evaluating settlement amounts in
16 this Circuit. *See, e.g., Officers for Justice,* 688 F.2d at 628 ("It is well-settled law that a
17 cash settlement amounting to only a fraction of the potential recovery does not per se
18 render the settlement inadequate or unfair.").

19 Moreover, Plaintiffs' estimated recovery figure is based upon their calculation of
20 provable damages under the Exchange Act, and does not take into account the various
21 defenses described above. *See* Rosen Decl., ¶ 21. If a jury chose to credit Defendants'
22 expert over Lead Plaintiffs' expert, in whole or in part, with respect to whether a
23 significant portion of the share price decline was causally related to Defendants' alleged
24 misrepresentations and omissions, this could have substantially reduced the total amount
25 of damages. Consequently, had the case been tried, there was a fair possibility that the
26 damages ultimately proved could have been lower. *See, e.g., Heritage*, 2005 WL
27 1594403, at *7 (citing *In re Sumitomo Cooper Litig.*, 189 F.R.D. 274, 282 (S.D.N.Y.
28

1999), where the court recounted several instances where settlement was rejected by a court only to have the recovery generated by continued litigation ultimately be less than the proposed settlement).

### 3. Risk of Maintaining a Class Action

Even if a class were to be certified outside the settlement proceedings herein, such an order would be conditional. Rule 23(c)(1) expressly provides that a class certification order may be "altered or amended before final judgment." *See, e.g., Viscaino v. U.S. District Court*, 173 F.3d 713, 721 (9th Cir. 1999) (certification order may be altered or amended "before the decision on the merits"). Consequently, whereas maintaining a class action to judgment is an expensive and risky enterprise, a fair and reasonable settlement is preferable to years of uncertainty—especially here where Defendants have made their intentions clear to challenge the fraud-on-the-market presumption of reliance. *See Heritage*, 2005 WL 1594403 at *6 ("[i]n most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.")(citing *National Rural Telecom. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004)(internal quotation omitted)). Similarly, because the scope of a class wide judgment is a greater detriment to Defendants than an individual action, even after an adjudication on the merits, the risk of ultimately not prevailing remains high. *See, e.g., National Rural*, 221 F.R.D. at 527 (if a class action obtains a successful judgment, an appeal is likely to follow); *see also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997)(jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal). Accordingly, this factor supports approval of the Settlement.

### 4. Stage of the Proceedings

Plaintiffs had sufficient information to evaluate their case and to assess the propriety of a settlement. Here, by the time the Settlement was reached, Lead Counsel had (1) conducted an extensive investigation of the facts alleged, including conferral

1 with a number of witnesses; (2) served written discovery requests to Defendants and
2 third parties; (3) reviewed and analyzed several thousands of pages of documents
3 produced by Defendants and third parties; (4) consulted with and conducted substantial
4 expert discovery, including but not limited to submission of expert report on market
5 efficiency, and consultation and preparation of expert reports on damages and
6 accounting; (5) opposed Defendants' motions to dismiss; and (6) actively monitoring
7 and making pertinent filings in NutraCea's bankruptcy proceedings. *E.g.*, Rosen Decl.,
8 ¶¶ 6, 13-16.

9 Under these circumstances, Plaintiffs and Lead Counsel were in an excellent
10 position to evaluate the strengths and weaknesses of their allegations against
11 Defendants, and the defenses raised thereto, as well as the substantial risks of continued
12 litigation, and to conclude that the settlement provides a fair, adequate, and reasonable
13 recovery, and is in the best interest of the Class.  Having sufficient information to
14 properly evaluate the Litigation, Plaintiffs have managed to settle this Litigation on
15 terms very favorable to the Class and without the substantial additional expense, risk,
16 and uncertainty of continued litigation. This factor weighs in favor of this Court's
17 approval of the settlement.

**5. Experienced Counsel Concur that the Settlement, Which was Negotiated in Good Faith and at Arm's Length, is Fair, Reasonable, and Adequate**

21 "[T]he fact that experienced counsel involved in the case approved the settlement
22 after hard-fought negotiations is entitled to considerable weight." *Ellis*, 87 F.R.D. at 18;
23 *see also National Rural*, 221 F.R.D. at 528 ("'Great weight is accorded to the
24 recommendation of counsel, who are most closely acquainted with the facts of the
25 underlying litigation'") (quoting *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104,
26 125 (S.D.N.Y.1997)). And "a presumption of correctness is said to attach to a class
27 settlement reached in arms-length negotiations between experienced capable counsel

after meaningful discovery." *Manual for Complex Litigation* (Third) § 30.42 (1995).

The Action has been litigated by experienced and well-respected counsel on both sides, all of whom specialize in this area of litigation. *See* Rosen Decl., ¶ 47, Exs. 2-3. Accordingly, this factor weighs in favor of the Settlement.

### 6. The Reaction of the Class Members to the Settlement[3]

The time to object to any aspect of the Settlement or to request exclusion was September 10, 2010. Eight shareholders have sought to be excluded from the settlement representing only 294,702 shares, or 0.12%, of the 193 million shares outstanding and available for trading. To date, two individual investors have submitted objections: (a) Gary Eudy who purchased 4,700 shares of stock during July 2007 at a cost basis of $14,829.66; and (b) Nedko Nedev who purchased 5,000 shares of stock on April 15, 2008 at an approximate cost basis of $4,250. *See* Rosen Decl., ¶ 59, Mulholland Aff. ¶ 9.

Mr. Nedev claims that the settlement should be for a larger amount - $10 million, but provides no reasoning other than he would like to have a more favorable recovery. Mr. Nedev also states that he "does not agree with the settlement, [because] all the arguments that had been written are absolutely not correct and vague"; yet he does not point to any information that he believes is necessary to evaluate the Settlement. *See* Mulholland Aff., ¶ 9, Ex. D.

Mr. Eudy disagrees with the settlement because "those stockholders who have been damaged by Defendant's misconduct should be compensated by receiving their

---

[3] On September 16, 2010 the Rosen Law Firm received a letter, dated September 12, 2010 from Seth Wood requesting that he be permitted to submit a late proof of claim, because he did not receive his notice and proof of claim form until after the claims filing deadline. *See* Mulholland Aff., Ex. E, & Rosen Decl., Footnote no. 2. SCS and Lead Counsel have agreed to permit Mr. Wood to submit a late proof of claim form. (Mulholland Aff., ¶ 11), SCS' administrative determination of claims will be addressed when Lead Counsel files a motion for distribution of the settlement funds approximately 120 days after the order and final judgment approving the settlement is entered.

11

1 original investment back, plus interest." He also claims the Notice is misleading
2 because per share estimates in the beginning of the Notice are similar, but different from
3 estimates elsewhere in the Notice. *See* Mulholland Aff., *Id.*
4       While Lead Counsel sympathize with Messrs. Eudy and Nedev's objections
5 concerning the Settlement, and also wish the Settlement was for a greater amount, the
6 Court should overrule their objections.  As discussed herein, there is no reason to believe
7 that continuing litigation would have resulted in a greater level of recompense for Class
8 Members. There simply is no viable source to provide a greater recovery to the Class.
9 There is only $700,000 remaining in the Insurance Policy after payment of the
10 Settlement – and 50% of any amounts remaining after resolution of any other claims
11 under the Policy will be paid into the Settlement Fund. Rosen Decl. ¶ 2.  The longer the
12 parties litigate this case, the more the Insurance Policy will be depleted by defense costs
13 meaning there will be less money to compensate Class members.  Continuing litigation
14 would likely result in a smaller recovery for Class Members, not greater.  Thus, while
15 Lead Counsel acknowledge Messrs. Eudy and Nedev's frustration with Defendants' not
16 fully repaying investors' losses, reason dictates the Court approve the Settlement.
17       To the extent that Mr. Eudy asserts that the Notice is somehow defective, he is
18 mistaken.  The Settlement Notice satisfied all the requirements of Federal Rule of Civil
19 Procedure 23(c)(2) and the PSLRA (15 U.S.C. § 78u-4(a)(7)).  The Notice (Mulholland
20 Aff., Ex. A) describes the nature of the Litigation; sets forth the definition of the Class;
21 describes the Class claims; discloses the right of Class Members to exclude themselves
22 from the Class, as well as the deadline and procedure for doing so and the binding effect
23 of the settlement approval proceeding to Class Members who do not exclude
24 themselves.  The Notice also describes the settlement and the portion that Plaintiffs
25 propose to distribute among the Class, both in the aggregate and on an average per-share
26 basis; explains the Proposed Plan of Allocation; states the parties' disagreement over
27 damages and other issues; sets out the amount of attorneys' fees and expenses that
28

1 Plaintiffs' Counsel intend to seek, including the amount of the requested fees and 2 expenses determined on an average per-share basis.  The Notice also summarizes the 3 reasons the parties are proposing the Settlement.  The contents of Notice therefore 4 satisfy all applicable requirements.

5 Mr. Eudy apparently claims that the Notice is misleading because on the first 6 page of the notice it provides an "average per share recovery" in relation to the 7 settlement amount and the total shares available and outstanding during the Class 8 Period.  He then compares that section to the section containing the Plan of Allocation 9 and calculation of Recognized Losses.  *See* Mulholland Aff., Ex. D.

10 On the first page of the notice, Plaintiffs provided the requisite "amount of 11 settlement proposed to be distributed to the parties to the action, determined in the 12 aggregate and on the average per share basis" (15 U.S.C. § 78u-4) as required by the 13 PSLRA.   This calculation is merely the amount of the Settlement divided by the total 14 number of shares outstanding and available for sale during the Class Period.  It is not 15 meaningful to compare this per share amount with the per share amounts set forth in the 16 Plan of Allocation which are based on the estimated loss per share for each share 17 purchased and held during the Class Period. The number of damaged shares is not the 18 same as the number of shares outstanding, which are only about 25% of the shares 19 outstanding.  Thus, the per share amount disclosed as required by the PSLRA is not an 20 indication of the average per share damage suffered by Class Members or an indication 21 of aggregate damages.

22 In the same sections of the Notice, the Notice clearly states:

> This is not an estimate of your actual recovery per share you should expect.  Your actual recovery will depend on the aggregate losses of all Class Members, the date(s) you purchased and sola NutraCea Stock and the total number of claims filed.
>
> \*     \*     \*
>
> This estimate is based on the assumptions set forth [above]. Your actual recovery, if any, will vary depending on your purchase price and sale price and the number of Proof of Claim forms filed."

1  Mulholland Aff., Ex. A.  The section containing the Plan of Allocation and the
2  determination of Recognized Losses clearly states that the section addresses
3  "compensable losses per share" or "Recognized Loss" for each claimant, which is
4  determined based on the inflation in the share price caused by the alleged fraud at the
5  date of purchase minus inflation in the share price at the date of sale." *Id.*  The formula
6  for the determination of Recognized Loss was determined upon consultation of
7  Plaintiffs' financial expert (discussed below in Section III).

8      Notwithstanding these two objections, the reaction by Class Members has been
9  overwhelmingly favorable.  *E.g.*, Rosen Decl., ¶ 24.  The Summary Notice of the
10 Settlement was published in *Investor's Business Daily* and electronically disseminated
11 over *PRNewswire* on or before July 8, 2010.  *See* Mulholland Aff., ¶ 7, Ex. B.  Claim
12 Packets, including a detailed Notice describing the Settlement and Proof of Claim form,
13 were sent to potential Class Members. Mulholland Aff., ¶¶ 4-6.  Approximately 2,317
14 claims have been filed by Class Members to date, and in doing so, they have
15 acknowledged the reasonableness of the settlement.  Mulholland Aff., ¶ 10.

16     The favorable reaction by the Class weighs heavily in favor of the fairness of the
17 proposed Settlement.  *See Hanlon*, 150 F.3d at 1027 (that the "overwhelming majority"
18 stayed in the class is "objective positive commentary as to its fairness"); *Mego*, 213 F.3d
19 at 459 (district court did not err in approving a settlement where there was a handful of
20 objectors and one opt-out in a 5,400 member class); *Stoetzner v. U.S. Steel Corp.*, 897
21 F.2d 115, 118-19 (3d Cir. 1990) (Twenty-nine objections out of 281 class members
22 "strongly favors settlement").    Clearly, the positive reaction of the Class weighs
23 heavily in favor of approving the Settlement.

24 **II.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION**

25     "Approval of a settlement, including a plan of allocation, rests in the sound
26 discretion of the court." *Heritage*, 2005 WL 1594403, at \*11 (citing *Class Plaintiffs*, 955
27 F.2d at 1284 (internal citation omitted)). "To warrant approval, the plan of allocation
28

1 must also meet the standards by which the...settlement was scrutinized – namely, it must
2 be fair and adequate." *In re MicroStrategy, Inc. Sec.Litig.*, 148 F. Supp. 2d 654, 668
3 (E.D. Va. 2001) (citing *Class Plaintiffs*, 955 F.2d at 1284-85; *In re Oracle Sec. Litig.*,
4 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994)). "A plan of allocation that
5 reimburses class members based on the extent of their injuries is generally reasonable. It
6 is also reasonable to allocate more of the settlement to class members with stronger
7 claims on the merits." *Oracle*, 1994 WL 502054, at *1. Therefore, as noted in
8 *MicroStrategy*,
9 148 F. Supp. 2d at 669:

> "a plan of allocation . . . fairly treats class members by awarding a *pro rata* share to every Authorized Claimant, [even as it] sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue."

The proposed Plan of Allocation herein was fully described in the Notice sent to the Class, at Paragraph 7 thereof. *See* Mulholland Aff., Ex. A. It was formulated by Lead Counsel, in consultation with an independent damages expert, with the goal of reimbursing Class members in a fair and reasonable manner. Each similarly situated authorized claimant will receive a *pro rata* share of the Net Settlement Fund (*i.e.*, $1.5 million plus interest and 50% remainder interest, less attorneys' fees and expenses). The Plan of Allocation does not discriminate between Class Members. *See* Rosen Decl., ¶¶ 28-30.

In short, the Plan of Allocation has a rational basis, Lead Counsel believes it fairly compensates Class Members, and this Court should approve it. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) ("When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational' basis.").

**IV.    CONCLUSION**

15

Whereas both the Settlement and the Plan of Allocation are fair, reasonable, and adequate, Lead Plaintiffs respectfully request that each be approved by this Court.

Dated: September 21, 2010                    Respectfully submitted,

**THE ROSEN LAW FIRM P.A**.

/s/ Phillip Kim
Phillip Kim (*pro hac vice*)
Laurence Rosen (*pro hac vice*)
Timothy Brown (*pro hac vice*)
350 Fifth Avenue, Suite 5508
New York, NY 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs


**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick (#004738)
J. James Christian (#023614)
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Fax: (602) 255-0103

Liaison Counsel for Plaintiffs

# CERTIFICATE OF SERVICE

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 350 5th Avenue, Suite 5508, NY, NY 10118. I am over the age of eighteen.

On September 21, 2010, I electronically filed the following PLAINTIFFS' MOTION IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on September 21, 2010

/s/ Laurence Rosen

Laurence Rosen